Roberta SWARTZENDRUBER, Appellee,

v.

Joseph W. LAMB, Executor of the
Estate of Hazel Belle Lamb,
Deceased, Appellant.

No. 96–1852.

Supreme Court of Iowa.

July 29, 1998.

Allan C. Orsborn of Orsborn, Bauerle &
Milani, Ottumwa, for appellant.

Edward J. Gallagher, Jr. and Cynthia A.
Scherrman of Gallagher, Langlas & Galla-
gher, P.C., Waterloo, for appellee.

Considered by HARRIS, P.J., and
LARSON, CARTER, LAVORATO, and
ANDREASEN, JJ.

CARTER, Justice.

Joseph W. Lamb was appointed as execu-
tor of the estate of Hazel Belle Lamb pursu-
ant to the terms of her will executed May 25,
1993. He was also the sole beneficiary of
Hazel's assets. Joseph now appeals from an
adverse judgment in will-contest litigation
brought by his sister, Roberta Swartzendru-
ber. That litigation resulted in a judgment
adjudicating in a single-jury trial that the
will under which Joseph was appointed as
executor, and four prior wills executed by
Hazel, were the product of undue influence.
These five wills were all executed by Hazel
within a period of thirteen months.

Joseph urges that, under the statutory
will-contest procedure established in Iowa
Code section 633.308 (1995) until the will
formally admitted to probate has been suc-

cessfully challenged, no issue of validity of prior wills is before the court. Consequently, he claims that the district court erred in allowing the jury to pass on the validity of four prior wills as well as the will that had been admitted to probate. He also contends that the district court erred in admitting evidence concerning transactions that occurred after Hazel's death and thus beyond the time that any undue influence might have occurred. Finally, Joseph urges that the attorney fees incurred in defending the will should be paid from estate assets irrespective of the result of the litigation. After reviewing the record and considering the arguments of the parties, we affirm the judgment of the district court.

Both Joseph and Roberta grew up on their parents' family farm near Oskaloosa. At the time of trial, Joseph was fifty-nine and Roberta sixty-one. Roberta obtained a B.A. degree at Simpson College following high school and immediately went to work for the United States Department of Agriculture in Washington, D.C. During her employment with that agency, she acquired an M.A. degree in economics and a law degree. She retired from government service shortly before this controversy arose. She is married. The evidence indicated that Roberta had maintained a close relationship with her mother after leaving home and visited her in Iowa regularly. In addition, Roberta frequently sent her mother cards, flowers, and presents.

Joseph, who has never married, continued to work on the family farm for seven years following his graduation from high school. He then worked for five years as a route driver for Pepsi–Cola and 7–Up bottling companies. Beginning in 1967, Joseph began working regularly as a steward on luxury yachts traveling in intercoastal waters between Florida and Maine and in the winters in the Bahamas. Between 1967 and 1990, this employment was interrupted only by a two-year period in the early 1980s when he managed an auto parts store in Ottumwa owned by his aunt. In 1990 Joseph returned to Oskaloosa and lived with his mother until her death. During this time, he and his mother purchased a house in Florida with their joint funds and spent considerable time there during the winter months.

Roberta testified at trial that after Joseph returned to live with their mother Hazel was reluctant to talk to Roberta when Joseph was present. She also testified that Joseph refused to allow her to speak to her mother on the telephone on more than one occasion when she had called. Roberta introduced evidence that, during the period of time Joseph was living with his mother, he purchased $150,000 in artwork with Hazel providing most of the funds. Roberta and her husband testified that, in their presence and in the presence of Hazel, Joseph had struck Roberta at Hazel's home in 1990. They also testified that Joseph had struck his aunt, Edith Edgren, in Hazel's presence in 1983. Although there was no evidence presented that Joseph had ever assaulted his mother, Roberta and her husband testified that Hazel would frequently caution them not to act against Joseph's wishes to avoid "riling him up."

Sometime in 1991, Roberta discovered that Hazel had a power of attorney authorizing her to transact the financial affairs of her sister, Edith Edgren. In conversations with Joseph and her mother, Roberta discovered that, at Joseph's urging, Hazel had converted a substantial portion of Edith's assets to cash. These funds had been used to purchase furniture for the home in which Hazel and Joseph lived, for vacation trips taken by Hazel and Joseph, and to purchase a new automobile for Joseph. In addition, another $268,000 of Edith's money was used to purchase stock in a brokerage account in the names of Hazel and Joseph. In December 1992 Edith Edgren died.

In January 1993 Roberta, who was a beneficiary under Edith's will, notified both Joseph and the lawyer handling Edith Edgren's estate that she wanted an accounting made of her aunt's assets during the time that the power of attorney held by Hazel had been in effect.[1] The lawyer for Edith's estate testi-

---

1. Under the terms of Edith's will, Hazel, Roberta, and Joseph were each to receive one-third of her estate.

fied at trial that Joseph was furious when he learned of Roberta's request and demanded in Hazel's presence and in the presence of the witness that Hazel remove Roberta from her will. Sometime later in the month of January, Roberta contacted an Iowa City lawyer who made a formal demand for an accounting of Edith's assets during the time the power of attorney was in effect. This resulted in certain assets that had been transferred to Hazel and Joseph being returned to the estate. It also resulted in a negotiated settlement between Hazel, Roberta, and Joseph with respect to the amount that would be paid to Roberta out of Edith Edgren's estate.

Between April 28, 1992, and May 25, 1993, Hazel executed five different wills. The evidence established that Joseph was present during virtually all of Hazel's business meetings with her accountants and attorneys during this time, including the conferences involving the making of these wills. Prior to the making of these five wills, Hazel had made three earlier wills. On May 23, 1975, she made a will leaving all of her property to her husband, Reuben. If Reuben did not survive her, Hazel's 1975 will divided her property equally between Joseph and Roberta. Reuben died in December 1981. On April 6, 1983, Hazel made a new will that provided for an equal disposition of her property between Joseph and Roberta. A will made by Hazel on September 23, 1986, contained substantially the same terms as her 1983 will except, unlike that will, it provided that if either Roberta or Joseph did not survive that person's share was to go to the other sibling. Roberta was named executor under the 1975, 1983, and 1986 wills.

The five wills that were placed in issue in Roberta's petition were in principal substance as follows:

(1) *Will of April 28, 1992.* Joseph was given a life estate in the family farm with an appraised value of $395,000, with the remainder to Roberta. All other assets in the estate constituting approximately $200,000 were given to Joseph.

(2) *Will of November 18, 1992.* Some personal and effects were given to Roberta. The family farm was given to Joseph for life with the remainder to Roberta. All other assets were given to Joseph.

(3) *Will of January 8, 1993.* All of Hazel's property was given to Joseph. If he did not survive, it was given to the tenants on Hazel's farm.

(4) *Will of January 19, 1993.* The provisions of this will were the same as the January 8 will except that, if neither Joseph nor the farm tenants survived, the estate was to be divided among three designated charities. This will contained express language disinheriting Roberta.

(5) *Will of May 25, 1993.* All property was given to Joseph. If he did not survive then the property was to go to Roberta's son, Daniel. This will also contained language expressly disinheriting Roberta.

Joseph was designated executor under all five of the wills summarized above. Hazel Lamb died on December 31, 1994. Her May 25, 1993 will was admitted to probate, and Joseph was appointed as executor. Roberta challenged that will on the basis of alleged undue influence. She also sought an adjudication that Hazel's four prior wills were also the product of undue influence.

The wills numbered (1), (2), and (3) above were prepared by attorney Hugh Ben McCoy and were executed by Hazel in his presence. Attorney McCoy had also prepared Hazel's 1983 and 1986 wills. Attorney McCoy testified that Joseph was present and dominated the conversation with respect to the preparation of the two 1992 wills and the January 8, 1993 will. In reflecting on the demeanor of Hazel and Joseph, he believed that these three wills were the product of undue influence executed on Hazel by Joseph.

The wills numbered (4) and (5) above were prepared by attorney Charles Kiple and were executed by Hazel in his presence. He testified that Joseph brought Hazel to his office on each occasion, but he did not recall whether Joseph remained in the room when the wills were executed. He testified that he obtained all of the information concerning

the proposed disposition of Hazel's property directly from Hazel. He recalled that Hazel was jovial and talkative on each occasion and told him that Roberta's education and good job had influenced her to give all of her property to Joseph. Attorney Kiple expressed the opinion that the last two wills executed by Hazel were not the product of undue influence.

Throughout these proceedings, Joseph has objected to a judicial determination of the validity of multiple wills in a single action. He asserted in the district court that the statutes governing will-contest litigation only allow a will that has been formally admitted to probate or formally proposed for probate to be challenged. The district court rejected this contention and submitted special verdicts requiring the jury to respond separately as to each of the five wills executed between April 28, 1992, and May 25, 1993. In its response, the jury found that each of these five wills was the product of undue influence. Other facts significant to the disposition of this appeal will be considered in our discussion of the legal issues presented.

## I. *Whether the Issues Surrounding the Validity of Five Wills Were Properly Determined in a Single Jury Trial.*

■ Joseph urges that, until the will formally admitted to probate had been successfully challenged, no issues surrounding the validity of the four prior wills were properly before the court. Based on this premise, he argues that it was error to permit the jury to reach a verdict concerning the validity of the four prior wills in the *action contesting the* May 25, 1993 will. The statute authorizing a challenge to a will already admitted to probate reads as follows:

Any interested person may petition to set aside the probate of a will by filing a written petition in the probate proceedings. The petition for such purpose shall state the grounds therefor.

Iowa Code § 633.308 (1995). Our reading of this statute suggests that it only deals with the right to challenge a will that has been admitted to probate. It does not speak to the issue of whether in challenging that will the objectors may, in the same action, chal-

lenge earlier wills that might be given effect if the will that has been admitted is found to be invalid.

Another Code section does contain language contemplating anticipatory challenges to wills before they have been admitted to probate. That statute provides:

Nothing herein contained shall prevent any interested person from filing objections to probate of a proposed will prior to probate thereof. If such objections are filed prior to the admission of the will to probate, the will shall not be admitted to probate pending trial and determination as to whether or not said instrument is the last will of the decedent.

Iowa Code § 633.310 (1995). Although the language of this statute is not directed to wills that are proposed or are *to be proposed,* it does offer some approval for determining the validity of wills before they have been admitted to probate.

Joseph contends that the procedure employed by the district court is in direct conflict with the holding of this court in *In re Estate of Cocklin,* 230 Iowa 415, 297 N.W. 864 (1941). That decision was rendered in an interlocutory appeal that challenged the attempt by the objectors in will-contest proceedings to litigate the validity of earlier wills in the same action challenging the will sought to be probated. The district court had ordered that only the latest will, which was the one formally offered for probate, was to be considered in the proceeding. In affirming that ruling, this court stated:

The single issue involved is the validity of the February Will and that issue alone should be tried and submitted to the jury for its consideration without having such issue clouded with [other] wills which had been made, revoked and destroyed.

*Cocklin's Estate,* 230 Iowa at 419, 297 N.W. at 865.

Roberta responds to Joseph's argument by directing our attention to the language of this court in *In re Estate of Klages,* 209 N.W.2d 110 (Iowa 1973), suggesting that, in order to avoid multiplicity, more than one will may be contested in a single action. The *Klages* appeal was in a declaratory judgment action,

seeking a judicial declaration of the legal effect of a prior will contest that successfully challenged some, but not all, clauses in a will. The decision of this court in the declaratory judgment action established that, because the invalidating of part of the will frustrated the presumed intent of the testator under an immediately prior will, the revocation clause of the later will would not be given effect. The prior will was allowed to stand as the testator's will unless it was also successfully challenged. In passing, we observed that the contestant could have challenged the prior will in the same action that challenged the will that had been admitted to probate. *Klages,* 209 N.W.2d at 114.

In making the statement concerning the contesting of multiple wills in a single proceeding, this court in *Klages* relied on a comparable opinion by the Wisconsin court in *In re Estate of Yahn,* 258 Wis. 280, 45 N.W.2d 702 (1951). Other decisions permitting the adjudication of the validity of multiple wills in the same action include *Ferriter v. Borthwick,* 346 Mass. 391, 193 N.E.2d 335, 336 (1963); *Ades v. Norins,* 204 Md. 267, 103 A.2d 842, 844–45 (1954); *In re Will of Hand,* 95 N.J.Super. 182, 230 A.2d 408, 412 (1967); and *Jones v. Witherspoon,* 182 Tenn. 498, 187 S.W.2d 788, 792 (1945).

In the *Ades* case, the Maryland court observed

> [c]ertainly no foresight is required to see that if the appellees were required to attack first the 1944 will and were successful, the appellant would offer the 1942 will for probate and the appellees would then attack it on the same grounds as had overcome the 1944 will.... A caveat may be filed to a will either before or after it is exhibited to the Register of Wills or the court for probate. [I]t was within the power of the Orphans' Court and appropriate, for it to consider the validity of both wills at the same time.

*Ades,* 103 A.2d at 844–45.

We agree with the admonition in *Cocklin's Estate* that consideration of facts surrounding the execution of earlier wills can, in some instances, distract the jury's focus from the facts surrounding the execution of the will that has been admitted to probate. When

that danger exists, separate actions should be required. We are convinced, however, that this is not the case with respect to the jury's consideration of the five wills that Hazel Lamb executed within a thirteen-month period. In presenting her theory of undue influence with respect to the May 25, 1993 will, Roberta necessarily had to place before the jury the facts surrounding the execution of the four earlier wills. This tightly linked chain of proof did not cloud the issues but rather illuminated them. It would have been a disturbing waste of judicial resources and litigation expenses to require her to present basically the same story in five successive jury trials. We hold that the procedure followed by the district court was not prohibited by statute and was permissible under the facts of this litigation.

## II. Whether Evidence of Joseph's Conduct After Hazel's Death Was Relevant to the Issues.

Joseph asserts that the district court erred in allowing, over his relevancy objection, evidence of acts or omissions on his part that occurred subsequent to Hazel's death. He urges that this evidence had no probative relevancy to the issue of whether he acted to influence Hazel's will-making during her lifetime.

Some of the evidence complained of was clearly relevant to the jury's evaluation of Joseph's actions during Hazel's lifetime. Included in this category of proof is the status of brokerage accounts and real estate titles following Hazel's death that cast light on Joseph's allegedly predatory practices during her lifetime. Other evidence objected to, such as Joseph's credit card debt after Hazel's death, was received by way of proper cross-examination based on answers given to other questions.

We agree with Joseph that some of the matters pursued in cross-examining him, such as his distributions from the estate while this litigation was pending, his delay in paying inheritance taxes, and his failure to maintain an estate bank account, were irrelevant to how he may have acted to influence Hazel during her lifetime. But, we are con-

vinced that these inquiries and Joseph's responses thereto were not sufficiently prejudicial to warrant a reversal of the judgment. Several responses were cumulative of other evidence received without objection.

### III. Whether Fees of Executor's Attorney Are Properly Payable From Estate Assets.

■ The district court ruled that the attorney fees incurred by the executor in defending the will were properly Joseph's personal obligation and were not payable from the assets of the estate. Joseph challenges that ruling along with the litigation issues involved in the appeal. He contends that irrespective of the result reached in the litigation, he was acting with a good-faith belief that he was carrying out the wishes of the testator.

In considering this issue, we must recognize that benefit to an estate is an elusive element and may not always provide a satisfactory guide for deciding the propriety of litigation involving the personal representative. In some instances, a personal representative's fiduciary obligation requires that a certain course of action be pursued irrespective of whether the benefits of that action will inure to the benefit of a particular distributee or claimant rather than to the estate as a whole. A personal representative is empowered to engage in litigation under Iowa Code section 633.81. This empowerment necessarily carries with it the right to retain counsel.

Relevant to this issue are the provisions of Iowa Code section 633.315, which provide:

When any person is designated as executor in a will, or has been appointed as executor, and defends or prosecutes any proceedings *in good faith and with just cause,* whether successful or not, that person shall be allowed out of the estate necessary expenses and disbursements, including reasonable attorney fees in such proceedings.

(Emphasis added.) Prior to the enactment of the foregoing statute, a bright-line rule had been developed by this court in those situations in which an executor proponent of a will was personally a real party in interest

and was unsuccessful in upholding the validity of the will. The view of this court in that situation is expressed in *In re Jenkins' Estate,* 245 Iowa 939, 65 N.W.2d 92 (1954). There, as in the present case, the district court had refused the executor's request to pay attorney fees incurred in a will contest from estate assets. In approving that result, this court stated:

Paul Morrison, while executor, was also the sole beneficiary under the alleged will. In defending the contest thereof he was in fact representing his own interests as against the heirs at law. Especially is this true, since it was found by the jury that he had exercised undue influence over testatrix in the procuring of the will. Under such circumstances, costs of the contest including attorney fees are not ordinarily chargeable against the assets of the estate.

*Jenkins' Estate,* 245 Iowa at 941, 65 N.W.2d at 93. This result was also approved in *In re Estate of Austin,* 194 Iowa 1217, 191 N.W. 73 (1922), in which this court observed:

It would seem to be the duty of the nominated executor to endeavor to sustain the instrument purporting to be the will, and to do so he must employ counsel and it would seem to be right that a reasonable attorney fee should be paid counsel for services rendered in an effort to probate the will. But such is not the rule announced by our court.

*Estate of Austin,* 194 Iowa at 1223, 191 N.W. at 75.

Joseph suggests that the bright-line rule approved in the *Jenkins' Estate* case and the *Estate of Austin* case has been relaxed by the enactment of section 633.315, which propounds a test of good faith and just cause. Assuming that this is true, it does not aid his cause. In denying the attorney-fee claim, the district court found:

The jury found that Joseph W. Lamb was the person who exerted the undue influence, and it appears to the Court that he could not have been acting in good faith and just cause.... [H]e stood to be the person who would benefit from a jury verdict upholding the validity of the May 25, 1993 will.

We believe this finding precludes an allowance of fees under the "good faith and just cause" test of section 633.315. Based on all the facts and circumstances of the case, it was a permissible finding for the district court to make. We have considered all issues presented and conclude that the judgment of the district court should be affirmed.

**AFFIRMED.**