**STATE of Iowa, Appellee,**

v.

**Harold Arthur DUNCAN, Appellant.**

No. 04–0062.

Supreme Court of Iowa.

Feb. 17, 2006.

Linda Del Gallo, State Appellate Defender, and David Arthur Adams, Assis-

tant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Bridget A. Chambers, Assistant Attorney General, Michael L. Zenor, County Attorney, and Michael J. Houchins, Assistant County Attorney, for appellee.

LAVORATO, Chief Justice.

A jury convicted Harold Arthur Duncan of first-degree murder. The victim was his wife of forty-three years, Karen Kay Duncan. Following sentencing, Harold appealed, contending the district court erred when it admitted character and bad-acts evidence as improper rebuttal evidence. We transferred the case to the court of appeals, which affirmed. We granted Harold's application for further review. On our review, we affirm the court of appeals decision and the judgment of the district court.

## I. Background Facts.

Harold and Karen, known as Kay, were married in December 1959. The couple lived in a motor home parked at a trailer court in Spencer, Iowa. Harold was retired, and Kay worked as a manager in a Subway sandwich restaurant in Spencer.

On January 13, 2003, Kay did not report to work at Subway. Her co-workers became concerned, and one of them drove by the Duncans' home where she saw the couple's van parked at the residence. The co-worker called a second co-worker and they decided to ask the Duncans' landlord to check on Kay at the couple's residence. The landlord received no response to her knocks on the door, which prompted her to call the police.

After failing to get anyone to come to the door, a Spencer city police officer gained entrance through a window. He found Harold and Kay sprawled out on their bed; Harold was face up and Kay was face down. Kay had been shot twice, once to the front of her body, and once to her back. She was pronounced dead at the scene. Harold appeared to have a serious wound to the face but was alive. Police found a shotgun in the hallway of the motor home. In the cockpit area of the motor home, the police found an open box of 12-gauge shotgun shells.

Harold was taken to a local hospital and then to a hospital in Sioux City where a Division of Criminal Investigation (DCI) agent interviewed him. Harold admitted shooting Kay twice and admitted shooting himself.

Later in the day, Harold was transferred to a hospital in Omaha where another DCI agent interviewed him. During this interview, Harold gave conflicting stories. In the first version, Harold said he and Kay had argued about her work schedule at the restaurant. He got the shotgun out and as the argument got out of control, he shot her in the chest and then as she turned around to retreat to the back of the motor home, he shot her in the back. In the second version, Harold related that Kay had gotten the shotgun out of a closet in the back of the motor home and he took it away from her. He then shot her in the chest and as she retreated towards the back of the motor home, he shot her in the back. The third version was the same as the first. Harold also told the agent that his wife was not "going to hold the answer to the argument" and admitted that he had attempted to kill himself.

## II. Proceedings.

On January 29, 2003, the State charged Harold with first-degree murder in violation of Iowa Code sections 707.1 and 707.2 (2001). Later, Harold filed a notice of diminished responsibility and a notice of self-defense.

Before trial, Harold filed a stipulation with the court in which he stated that on January 13, 2003, he fired two shots from a 12-gauge shotgun resulting in the death of his wife, Kay. He fired one shot to her chest and one shot to her back.

At trial, the stipulation was read to the jury. Additionally, the jury heard testimony regarding Harold's admissions to the DCI agents. Testimony also revealed that Harold had a sixth-grade education and functioned at a range between mental retardation and below-average intelligence.

Harold testified as follows. Kay called him into their bedroom and told him she wanted a divorce. At the time, Kay was lying on the bed and pulled out a shotgun. He grabbed the shotgun and took it away. He then grabbed her and she slid off the bed, and, as he characterized it, "[t]hat's when everything went wrong." He had no recollection of what happened after that.

Following trial, a jury found Harold guilty of first-degree murder. The court later sentenced Harold to life in prison.

Harold appealed, and we transferred the case to the court of appeals. The court of appeals affirmed. We granted Harold's application for further review.

### III. Issues.

On appeal, Harold raised the following issue: Whether the district court erred in admitting evidence of his character and prior bad acts as improper rebuttal evidence.

### IV. Defendant's Character and Prior Bad Acts.

**A. The challenged evidence.** The issue revolves around the cross-examination of Harold and the subsequent rebuttal testimony of one of his daughters. On direct examination, Harold testified about going to the bank several days before the shooting so that Kay could open accounts in her name and remove her name from the accounts that she jointly held with him. Harold also testified about Kay's discussion of divorce.

On cross-examination of Harold, the following exchange took place without objection:

Q. And isn't it true that you were shaking violently when you were at Northwest Federal? A. What is violently?

Q. Shaking? A. Well, yeah. They were shaking pretty good. We sat there in the chair, Kay and I did, together.

Q. And that's because you were upset and angry with Kay because she was opening up her own account? A. No, sir. Mother could have any account she wanted. My three daughters are out here in the crowd. They could tell you.

Later, during the cross-examination, the prosecutor focused on the relationship between Harold and Kay, again without objection:

Q. You talked about your relationship with your wife, Kay? A. Yes, sir.

Q. That was an abusive relationship, wasn't it? A. I got three daughters out there. I don't think so, and I don't think they'll tell you that either. We had a wonderful time. We had a great big boat. We went to Lake Superior. I named the boat Lady Kay and we always got fish. We hunted together. My wife road hunt, so she would load the gun and handed it to me when we went out, and I would slide it out of the case and walk the ditches. We were together, her and I.

Harold was then asked about hitting Kay, calling her names (such as fat and stupid), and belittling her. He admitted striking Kay once that left bruises, but did

not recall any other time that he hit her. He denied the name calling and belittling.

The State presented the following rebuttal evidence, consisting of the testimony of the Duncans' youngest daughter:

Q. You've been present during the testimony during this trial. Correct? A. Correct.

Q. When your father was testifying, he said it was—that he was a good father, he was a good husband, and that we should just ask his daughters whether he was such. And you're one of his daughters? A. Correct.

. . . .

Q. Okay. I'm going to ask you then what type of father was the defendant? A. My father—

It was at this point that the defense counsel made his first objection:

DEFENSE COUNSEL: Hold on one second, please. Your Honor, I don't mean to interrupt this young lady but the question that [the prosecutor] is prefacing came vis-à-vis his cross-examination, not something we put into evidence and, two, it's not really relevant to any issue that's framed here and it's improper character evidence at this point in time.

THE COURT: Well, the objection is overruled. Go ahead and answer the question.

Q. What type of father was the defendant, Harold Duncan?

The daughter then testified about Harold being an abusive alcoholic. She said the children were abused, hit, and pushed through doors. The prosecutor also asked the daughter how Harold treated Kay. The daughter replied:

My father abused my mother very badly. Many times to get us children to behave he would take it out on my mom if we did something wrong. There [were] points where there [were] incidents where one time we were out boating and he threatened to push her over the boat and told us kids when he accomplished that that we would be next.

It was at this point that the defense counsel lodged his second objection:

DEFENSE COUNSEL: Your Honor, at this point again I would renew my objection that we're really getting out in left field for events that took place forty years ago.

THE COURT: We understand it was a long time ago.

The daughter testified further that an officer had explained the change in domestic abuse laws to her father. The daughter admitted that after a period of time, the physical abuse stopped.

The prosecutor then sought testimony from the daughter concerning the more recent state of affairs between Harold and Kay:

Q. I want to move to the more current situation between your father and your mother. Let's move to the last three or four years, two or three years prior to her death. A. Okay.

Q. How would you describe their marital relationship? A. My father was very controlling of my mother. My mother was not allowed to drive anywhere. She did hold a driver's license but it was for identification purposes only. Dad did drive her to and from work, not that that was really a choice, you know. My father was very belittling of my mother. When they would come to visit, he would not allow us the time alone together for fear of what we would talk about. He controlled the keys. He would hold the keys. If she wanted to go out to the van or motor home, she would have to ask him for the

keys and return them to him as soon as she returned.

. . . .

Q. Were there times where the defendant actually threatened your mother's life? A. Yes, there were. The boat incident I spoke of earlier. Also there was a time when one of my sisters was home with her two small children and my—it was a Christmas Eve and—

Q. Were you present during this? A. Yes, I was. I was. It was Christmas Eve and my father had been drinking and had become violent and actually sat and pointed at us and counted how many bullets you would need to kill us all.

Under cross-examination, the daughter admitted that the majority of her comments related to situations when Harold was drunk, that he stopped drinking in 1983 when he got treatment, and he was sober for twenty years.

On the State's redirect examination, the prosecutor asked the daughter to tell the jury what type of mother Kay was. The defense counsel objected on the ground that testimony was outside the scope of direct. The court overruled the objection. The daughter then responded:

My mom—When I first got the call from Terry Klooster right after this happened, he asked me to explain the relationship and explain my father, my mother. And the best way I can describe it is to know my mom was to love my mom, to know my dad was to tolerate my dad. My mom was a very loving woman, very loyal, you know. To know her was to love her.

**B. The parties' contentions.** Harold's contentions are as follows. First, the rebuttal testimony of the daughter about Harold's failures as a father or husband in the forty years prior to Kay's death was not relevant as to why Harold allegedly murdered his wife because it did not demonstrate proof regarding any of the exceptions stated in Iowa Rule of Evidence 5.404(b). For that reason that testimony was inadmissible.

Second, the daughter's rebuttal evidence, though ostensibly offered to challenge Harold's credibility, went solely to his character. Such evidence established Harold's alcohol abuse; his negative, controlling character; and his propensity for abuse. The rebuttal evidence was entirely devoted to the demolition of Harold's character.

Third, the daughter's rebuttal testimony about what a loving mother Kay was constituted an appeal to the jury's passions and borders on prosecutorial misconduct.

Last, the rebuttal evidence would normally not have been admitted under rule 5.404(b). The prosecutor sought to "bootstrap" this evidence under the guise of impeaching Harold's credibility. What transpired had all the trappings of a "setup" because in cross-examining Harold, the prosecutor asked a question that, on its face, was bound to elicit a response favorable to Harold so that the prosecutor could use otherwise inadmissible evidence to impeach the self-serving response.

The State contends that all of the challenged evidence was admissible under rule 5.404(b) to show Harold's intent in shooting his wife and to rebut his claims of self-defense and diminished responsibility. Additionally, the State contends that the evidence of Kay's good nature was properly admissible to rebut Harold's claim that she was the aggressor in the altercation. Finally, even if any of the challenged evidence was admitted in error, the error was harmless in light of the overwhelming evidence of Harold's guilt.

**C. Analysis.** Iowa Rule of Evidence 5.404(b) provides that

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Iowa R. Evid. 5.404(*b* ). The key to whether evidence of other crimes, wrongs, or acts is admissible is whether such evidence " 'is relevant and material to some legitimate issue other than a general propensity to commit wrongful acts.' " *State v. Plaster,* 424 N.W.2d 226, 229 (Iowa 1988) (citation omitted). On the admissibility issue, the district court employs a two-step analysis. First, is the evidence relevant? Second, even if relevant, does the probative value of such evidence substantially outweigh the danger of unfair prejudice pursuant to the balancing test under Iowa Rule of Evidence 5.403? *Id.*

Here, whether there was prejudicial error requiring reversal in the admissibility of evidence of past abuse described in the daughter's rebuttal testimony hinges on the issues of relevancy and prejudice. To put the matter in context, we must understand the defense's theory underlying its self-defense claim, as shown in the following portion of the defense counsel's final argument:

Here's one of the things that we had as a problem in looking at this case. Why would Karen Duncan take a loaded shotgun to bed? Doesn't make sense. I mean, people don't normally take loaded shotguns to bed, do they? Not in my household. But they do if they've suffered from domestic abuse for the last forty-six years, don't they? They do when she's so fearful.

Tammy Schwarting goes out to the trailer that morning because she doesn't show up for work. They're so fearful that the cell phone person . . . noted the fear in this woman. They would if—she not only expresses herself to Lola Wood, the Northwest Federal employee who changed the accounts. . . .

And last but not least, [the Duncans' daughter] testified. You heard her yesterday as to the years of abuse. You take a gun to bed because you know you're going to be getting divorced and you don't know how he's going to act and you want to be protected. That's why she took the loaded shotgun to bed that January 12, 2003.

Counsel continued:

The blood got on the gun because Mr. Duncan was already shot when he got control of the gun. He loaded it with another shell, shot it twice at his wife. The blood got on the stock because there was blood on his hand. . . .

. . . .

Now, let's think about this a second. You've just had half your face blown off and you go down. You regain consciousness—or semiconsciousness. What's your first thought? She's in the back bedroom and that is where the rest of the guns are. Even though I've got this one, the other guns are back there. She's going for another gun.

. . . .

One last thing that I haven't touched upon is that after Harold was shot, Kay Duncan did pick up her cell phone. I submit to you that she tried to call 911 for an ambulance. That is why when they found her body, she was holding the cell phone.

What happens when somebody is injured? She wasn't running out of the place. She was trying to call for an ambulance for her husband who just had half of his face blown off. She never got

that call made because she was shot then.

As one can see, Harold's self-defense claim is very simple. Kay takes the shotgun to bed to defend herself against Harold in the event he reacts violently, as he has in the past, to the news of her decision to seek a divorce. Kay shoots Harold first. Then in fear of being shot again, Harold takes the gun away from Kay and shoots her. What fuels the defense is Harold's past abuse which causes Kay to fear Harold and induces her to get him before he gets her.

The above excerpts from the defense counsel's final argument and the following discussion show that counsel began laying the foundation for this abuse-induced fear beginning with voir dire, continuing with opening statement and cross-examination of some of the State's witnesses, and culminating with counsel's explanation of the self-defense claim.

In voir dire, the defense counsel mentioned Harold's abuse several times:

[T]here is going to be some testimony of possible—some domestic abuse in this household, some bad things there. Even though that person has, or what you may learn or believe at the end of the case, has a history of that or that the victim had gone through a period of time of that, being abused, do you feel that the person [is] still entitled to the self-defense protection under the law and if the circumstances weren't, they have the right even though in the past they may have been a no good SOB but under those circumstances they still have the right to protect themselves?

. . . .

. . . [Y]ou're going to hear about domestic violence and abuse, things of that nature. Are you going to be able to say, "Yeah, I know he may not have been the best person in the world but he's still entitled to this self-defense protection under our laws"?

. . . .

. . . That is the guy. I know he's a bad person and I know he's done things probably not in retrospect happy about today in looking back, but he's still entitled to that self-defense. . . .

. . . .

. . . [O]ne of the things that you're going to hear, there is going to be some maybe bad things about Mr. Duncan. . . . [A]re you going to be able to say, even though he may not be the type of person I like, he is still entitled to the self-defense protection under Iowa law?

. . . .

. . . [T]here is going to be some testimony in the case about domestic abuse. If the Court directs you that, even though there is domestic abuse out there, that Mr. Duncan's entitled to the defense of self-defense even though he may be a bad person, do you think you could follow that?

. . . .

. . . There is going to be evidence that domestic abuse—that's going to come out in this case. You understand, even though you may not like Mr. Duncan at the end of this case, you may think he's—you may not find him to be a good person. Even though you don't like him, you don't like the things he's done, he's still entitled to the defense under the law of self-defense.

In final argument, the defense counsel reminded the jurors about what he had said in his opening statement concerning the abuse:

Last but not least, we have [the Duncans' daughter's testimony]. She testified about the years of abuse. If you recall my opening statement to you, I

told you that these events were the culmination of a marriage which was marked with abuse.

In his cross-examination of three of the State's witnesses, the defense counsel attempted to plant the seed of the theory underlying the self-defense claim by emphasizing Kay's fear of Harold. Tammy Schwarting, one of Kay's co-workers, testifying for the State without objection, described the relationship between Harold and Kay as "different at different times. There [were] times where it was very good, and then there [were] times that it was very rocky. But as long as it was Harold's way, it would be okay." On occasion, according to this witness, Harold would belittle Kay by calling her "fat" and "stupid."

On the defense counsel's cross-examination of Schwarting, there was this exchange:

Q. And, in fact, when you and I previously met last April, you characterized their relationship was one in which you indicated that she kind of had to walk on eggshells? A. Yes, she did.

Q. Their relationship became more tense as the months progressed prior to the time of her death. Correct? A. Yes.

. . . .

Q. But there is no question whatsoever in your mind that she became fearful of Harold Duncan? A. I did not say she was fearful of Harold.

Q. All right. You said she walked on eggshells? A. Yes, I did.

Q. What did you mean by that? A. She just had to be very careful of what she did. . . .

. . . .

Q. Karen Duncan did not appear for work the 13th. . . . A. No, she did not.

Q. And that gave you great concern? A. Yes, it did.

Q. What specifically was your concern? A. I was scared that something had happened to Kay.

. . . .

Q. Did you ever indicate to Officer Lawson or Officer Warburton that you thought Harold may have harmed her? A. I may have said, yes, he could have hurt her.

The State offered two other witnesses, Pamela Santage and Lola Wood, who had seen and talked with Kay several days before her death. Santage, an employee of a local cell phone company, testified that she had sold Kay and Harold a cell phone some time before the events in question. She also testified that three days before Kay's death she sold Kay a cell phone. Santage related that Kay was upset and appeared to have been crying. Santage further related that Kay said she needed a cell phone to keep in contact with her place of employment, that Harold would not let her use the phone they had, that she could not believe she had been so stupid so long and she was not going to be with him anymore, and that Harold was worse than he had ever been. This testimony too came in without objection.

The defense counsel's cross-examination of this witness was very short and again emphasized Kay's fear of Harold:

Q. But there was a marked difference on the 10th day of January 2003, when she came in to see you, wasn't there? A. Yes. She was very upset.

Q. Fearful? A. I think so, in some respect.

And finally, Wood, a bank employee, described without objection her meeting with Harold and Kay at a local bank in Spencer on the same day. Wood testified that Kay wanted to be taken off of the

joint account with Harold. Wood testified that Kay was sad while Harold was shaking violently the whole time during the transaction.

The defense counsel's cross-examination of this witness was likewise very short, resulting in this exchange in which counsel again emphasized Kay's fear of Harold:

Q. I take it you felt she was in distress? A. Yes, I did.

Q. Distress, the fear was pretty heightened, wasn't it? A. Yes, it was, sir.

Q. About as high as you can get when you, recognizing that stress, instead of shaking her hand, wanted to give her some comfort by patting her back—A. Yes.

Q.—and hugging her. Am I right? A. Yes.

On cross-examination of the State's firearms expert, the defense counsel obtained a concession that the expert could not determine whether Harold or Kay was shot first. This concession of course was important to the defense's theory underlying its self-defense claim.

So it is clear that beginning with voir dire, the defense counsel was relying on Harold's past abuse of Kay to support the defense's theory that fear moved Kay to be the aggressor in a violent confrontation that culminated in her death. Later, in his final argument, the defense counsel made clear how the past abuse-induced fear was relevant to the theory underlying the self-defense claim.

It would be strange indeed for us to allow Harold to use what he now contends is irrelevant and prejudicial evidence to support this theory of self-defense and following an unfavorable verdict allow him to urge reversal on appeal based on the same evidence. He cannot have it both ways. He may not do so because of the rule commonly referred to as judicial estoppel but more accurately referred to as preclusion of inconsistent positions. *See* 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4477, at 549 (2d ed.2002); *Vennerberg Farms, Inc. v. IGF Ins. Co.,* 405 N.W.2d 810, 814 (Iowa 1987).

In *Snouffer & Ford v. City of Tipton,* this court described the doctrine of judicial estoppel against inconsistent positions this way: "A party who has, with knowledge of the facts, assumed a particular position in judicial proceedings is estopped to assume a position inconsistent therewith to the prejudice of the adverse party." 150 Iowa 73, 84–85, 129 N.W. 345, 350 (1911). The court explained the rationale for the doctrine:

> If [taking inconsistent positions] were permissible, there would be no end of litigation, for with every defeat a party might change his ground, mend his hold, and proceed indefinitely. Some courts have said that to take advantage of this rule the party to be estopped must be successful on his original claim. This is true in some cases, but this rule is not applicable here. . . .

*Id.* at 86, 129 N.W. at 350.

■ More recently, we have described the doctrine as a " 'common sense' rule, designed to protect the integrity of the judicial process by preventing deliberately inconsistent—and potentially misleading—assertions from being successfully urged in succeeding tribunals." *Wilson v. Liberty Mut. Group,* 666 N.W.2d 163, 166 (Iowa 2003) (citation omitted); *see also Beddall v. State St. Bank & Trust Co.,* 137 F.3d 12, 23 (1st Cir.1998) ("We generally will not permit litigants to assert contradictory positions at different stages of a lawsuit in order to advance their interests."). Because the doctrine is intended to protect the courts rather than the litigants, an

appellate court may raise estoppel on its own motion. *In re Cassidy*, 892 F.2d 637, 641 (7th Cir.1990).

Courts have applied the doctrine to bar a person from relying in the same proceeding upon evidence that the person has brought into the case and then later assails it. 28 Am.Jur.2d *Estoppel and Waiver* § 79, at 504 (2000). In *Pace v. Assessor of Islip*, 252 A.D.2d 88, 682 N.Y.S.2d 447, 450–51 (N.Y.App.Div.1998), a homeowner who relied on a residential assessment ratio to prove full market value of his property in the lower tribunal could not thereafter on appeal take a position impeaching this value. In *McKesson HBOC, Inc. v. Islamic Republic of Iran*, 271 F.3d 1101, 1110–11 (D.C.Cir.2001), *vacated in part on other grounds*, 320 F.3d 280, 281 (D.C.Cir. 2003) (per curiam), the appellate court barred a party from claiming the trial court erred because it used the wrong exchange rate in calculating the amount of an award when the party's own expert used the same exchange rate. And in *Georgetown Manor, Inc. v. Ethan Allen, Inc.*, 991 F.2d 1533, 1540 (11th Cir.1993), the appellate court barred a party from claiming the trial court erred in submitting the question of how interest was to be calculated when the party agreed on three alternatives, one of which the jury chose.

Here, it is clear from the defense counsel's voir dire and opening statement that not only was the jury aware of Harold's past abuse but they were also expecting such testimony. Moreover, the defense counsel painted Harold as a bad person who nevertheless was entitled to the defense of self-defense under the law. And then the jury learns in the defense counsel's final argument why evidence of Harold's past abuse and bad character was relevant to his defense. The defense counsel used the daughter's rebuttal testimony to Harold's advantage by noting that there were years of abuse. In effect, the defense counsel invited what Harold now complains was error.

We have not overlooked the fact that the defense counsel objected to the daughter's rebuttal testimony. Ordinarily a defendant does not waive error by referring to evidence that the defendant has unsuccessfully challenged. For example, in *State v. Jones*, the district court overruled a pretrial defense motion to prohibit the State from using the defendant's prior conviction for impeachment purposes on cross-examination. 271 N.W.2d 761, 765 (Iowa 1978). During trial, the defense counsel brought out the defendant's conviction during direct examination of the defendant. *Id.* This court held that when

> the issue is fully argued and trial court, carefully apprised of defendant's objection, rules evidence of prior convictions admissible, we are not convinced defendant must abandon all trial tactics to preserve error. We hold defendant has not waived his right to assert error in this instance.

*Id.* at 766.

In contrast to *Jones*, the defense counsel here never challenged evidence of past abuse before the daughter's rebuttal testimony. To the contrary, the defense counsel from voir dire on made it very clear to the jury that there would be such evidence. Moreover, the defense counsel in *Jones* was attempting to take the sting out of the prior conviction evidence. In contrast, the defense counsel here was taking advantage of the past abuse evidence to support the defense theory underlying the claim of self-defense. The trial strategies were therefore entirely different. Under these circumstances, we think Harold waived error regarding the rebuttal testimony. Moreover, we think the defense counsel's objection to the rebuttal testimony was apparently an attempt to preserve error in the event the defense counsel's strategy did not work. But, as we have

said, Harold cannot have it both ways. To reverse this case on the grounds that Harold now urges would not only be prejudicial to the State but would also encroach upon the integrity of the judicial process.

In fairness to the appellate counsel, we must point out that he was not the trial counsel. It is clear to us the appellate counsel had no choice but to take a position inconsistent with the position the trial counsel took. At the same time, we are not criticizing the trial counsel's strategy. Given the overwhelming physical evidence of guilt coupled with Harold's admissions, this was Harold's best chance for acquittal.

█ As to the claimed setup, we reject it out of hand because we are convinced there was no setup. In *State v. Werts*, we described the prosecutor's cross-examination of the defendant and a rebuttal witness's testimony as having "all the attributes of a setup." 677 N.W.2d 734, 737 (Iowa 2004). By that we meant that "[i]n cross-examining the defendant, the prosecutor asked a question that, on its face, was bound to elicit a response favorable to defendant so that he could use otherwise inadmissible evidence to impeach the self-serving response." *Id.*

Here, everyone in the case was well-aware of Harold's past abuse. The defense counsel had talked about it in voir dire and opening statement. And several defense witnesses had also talked about it. So the question, "That was an abusive relationship, wasn't it?" was not on its face bound to elicit a favorable response. Given what went on before, we think the prosecutor as well as the defense counsel and jury were caught off guard by Harold's response. Because of Harold's low intelligence, he probably was not in tune with the defense counsel's reasons for wanting the abuse in evidence.

█ We also find no basis for reversal based on Harold's contention that the daughter's description of her mother as a loving person constituted an appeal to the jury's passion and borders on prosecutorial misconduct. Because no such objection was made to this testimony, the claimed error was not preserved. Iowa R. Evid. 5.103(*a*)(1); *State v. Martin*, 704 N.W.2d 665, 669 (Iowa 2005). Moreover, the testimony was cumulative because other witnesses had already given similar testimony without objection. *See Swartzendruber v. Lamb*, 582 N.W.2d 171, 175–76 (Iowa 1998) (concluding inquiries and responses "were not sufficiently prejudicial to warrant a reversal of the judgment" because "[s]everal responses were cumulative of other evidence received without objection"); *State v. McCurry*, 544 N.W.2d 444, 448 (Iowa 1996) (holding district court did not err in admitting reports that "were merely cumulative of evidence already in the record").

## V. Disposition.

During trial, Harold relied on evidence of his past abuse to support his claim of self-defense. He cannot now on appeal urge reversal on the grounds that such evidence was irrelevant and prejudicial. Moreover, we are not convinced there was a setup by the prosecutor. Finally, we find no reversible error based on Harold's contention that the daughter's description of her mother constituted an appeal to the jury's passion and borders on prosecutorial misconduct. Error was not preserved on this ground. In any event, such evidence was cumulative. For all these reasons, we affirm the court of appeals decision and the district court's judgment of conviction and sentence.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**