STATE of Iowa, Appellee,

v.

LeAnn Faye WERTS, Appellant.

No. 01–1813.

Supreme Court of Iowa.

Feb. 25, 2004.

As Amended on Denial of Rehearing
April 5, 2004.

Alfredo Parrish and Andrew Dunn of Parrish, Kruidenier, Moss, Dunn, Boles, Gribble & Cook, L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, Mary E. Tabor, Assistant Attorney General, John P. Sarcone, County Attorney, and Frank Severino and Susan Cox, Assistant County Attorneys, for appellee.

CARTER, Justice.

Defendant, LeAnn Werts, appeals from a conviction of first-degree murder in regard to the death of a twenty-one-month-old child for whom she provided day care. The court of appeals reversed the conviction based on its conclusion that prior bad-acts evidence should not have been allowed. For reasons hereinafter stated, we agree with the conclusion of the court of appeals. The decision of the court of appeals is affirmed, and the judgment of the district court is reversed and remanded.

Defendant operated a day care center out of her home. She provided regular day care for Ben Vorwerk between April and November of 2000. In November 2000 Ben was twenty-one months old. On November 16, at approximately 1 p.m., defendant called 911 from her Altoona home and reported that Ben had stopped breathing. When paramedics arrived, defendant was giving Ben CPR on the floor. Emergency personnel observed that the child was comatose, his skin was ashen, and his lips were blue. When questioned by paramedics and later by police, defendant stated that Ben had choked on his lunch of macaroni and cheese and green beans.

Ben was taken to Blank Children's Hospital in critical condition. Upon arrival doctors observed no brain activity, abnormal hemorrhaging in the back of his eyes, and several bruises on his forehead, chin, and left shoulder. A swatch of hair on his left scalp looked as if it had been pulled out. Ben was declared brain-dead at 10:07 a.m. on November 17, 2000.

During the autopsy that ensued, the medical examiner found no signs of choking. The brain was very swollen, and

there were multiple impact injuries inside Ben's scalp. The medical examiner concluded that Ben had received a fatal injury in the nature of blunt-force trauma.

The medical examiner consulted with the pediatric neurosurgeon with regard to cause of death. The consulting physician did not believe that Ben had choked and concluded his injuries were caused by his head hitting something very hard just a few minutes before the paramedics arrived.

The State's evidence at trial was basically that which has been recounted above. The defense produced an expert who testified that the fatal injury was from a massive head trauma that occurred several hours or even days before the paramedics arrived. The jury found defendant guilty of first-degree murder. Other circumstances of note will be reviewed in our discussion of the legal issues presented.

## I. *The Court of Appeals Decision.*

■ The court of appeals' reversal of defendant's conviction arose from the following circumstances. Following defendant's testimony in chief, she was questioned on cross-examination concerning a conversation that evening with Ben's parents at the hospital where Ben was taken.

Q. And then after you had a chance to talk to the doctor, you looked over at Jeff and Laura [Ben's parents], didn't you? A. I don't recall.

Q. And you admitted to them that the relationship that you had with them was not the greatest, didn't you? A. Yes.

Q. And you told them that you would never hurt Ben; is that right? A. That's true.

Based on the foregoing testimony by defendant, the State sought permission to call a rebuttal witness "for impeachment purposes." This impeachment was to consist of the testimony of a neighbor who once saw the defendant pick up Ben and slam him down on his bottom. Counsel for defendant objected to the State's intended rebuttal evidence, and in an out-of-court colloquy, the district court determined that this evidence could be admitted for impeachment purposes. In the same ruling, the court declared that the State could not use this one instance of specific conduct as a basis for an opinion by the witness as to defendant's propensity for violence. Following the court's ruling, the prosecutor called Sandra Karns, defendant's neighbor, who gave the following testimony:

Q. We've heard testimony in this case that the defendant stated that she would never hurt Ben. On the day that you were standing in your toy room and looking over at the defendant's house, did you see something that is in contradiction to what the defendant said? A. Yes, I did.

Q. Can you tell the jury what it is that you saw? A. I saw LeAnn walk up to Ben, they were standing on the front sidewalk there, and she picked him up by his arm, raised him up, and slammed him down onto his bottom and then just walked away from him.

Q. What was Ben's response to this? A. He started crying.

Q. Did it appear that Ben was in pain after he was picked up by the arm and dropped down? A. He was crying fiercely. Yeah, I'm assuming he was.

The court of appeals held that it was prejudicial error to admit Karns' testimony. It noted that defendant had not testified that she had never hurt Ben, but rather that she had told his parents "that [she] would never hurt Ben." The court of appeals concluded that Werts' testimony did not pertain to what defendant had told Ben's parents and thus did not contradict

that to which defendant had testified. The court of appeals rejected the State's claim that the evidence was independently admissible as relevant to an issue at trial on the ground that this had not been the purpose for which the evidence was offered at trial.

We agree with the court of appeals conclusion that Karns' testimony was improperly admitted as impeachment evidence. Our conclusion in this regard is not based entirely on the fact that the testimony sought to be impeached concerned a conversation rather than prior acts of defendant. It is also based on the fact that what transpired had all the attributes of a setup. In cross-examining defendant, the prosecutor asked a question that, on its face, was bound to elicit a response favorable to defendant so that he could use otherwise inadmissible evidence to impeach the self-serving response. This type of bootstrapping bears a strong resemblance to that which this court condemned in *State v. Turecek*, 456 N.W.2d 219 (Iowa 1990). In *Turecek* we stated:

> The State is not entitled ... to place a witness on the stand who is expected to give unfavorable testimony and then, in the guise of impeachment, offer evidence which is otherwise inadmissible. To permit such bootstrapping frustrates the intended application of the exclusionary rules which render such evidence inadmissible on the State's case in chief.

*Turecek*, 456 N.W.2d at 225. In the present case, it had been established in a pretrial ruling that bad-acts evidence of the type involved here was not to be admitted as evidence. The fact that this ruling came in response to a motion filed by the State does not limit its binding effect to the extent that it applied to evidence that the State wished to present.

■ We cannot agree with the court of appeals' rejection out of hand of the claim that the evidence was independently admissible on the basis that the State had not urged other grounds for admissibility when it was offered at trial. We recognized in *DeVoss v. State*, 648 N.W.2d 56, 62–63 (Iowa 2002), that evidentiary rulings may be upheld on a theory not urged at trial. We indicated that this rule was based on "the realization that on retrial the error could easily be corrected." *DeVoss*, 648 N.W.2d at 62.

■ Our statements in *DeVoss* do not mean, however, that an appellate court must always accept a proffered alternative basis for admissibility that is advanced for the first time on appeal. The State now urges that, even if this evidence was not properly admitted for impeachment purposes, it was relevant to show malice. The admissibility of bad-acts evidence, even if relevant to some issue in the case, is subject to a balancing of the probative value of the evidence against its prejudicial effect as required by Iowa Rule of Evidence 5.403. Because the district court considered the evidence for impeachment only, it was not specifically required to make the balancing test that is mandated for substantive proof under the rules of evidence.[1] There is no indication that the court did so in the present case. It therefore falls on this court to engage in such balancing in order to determine whether the State's claim for an independent basis for admissibility should be accepted. We are satisfied that the prejudicial effect of this evidence outweighs its probative value. Consequently, we affirm the decision of the court of appeals that this evidence should have

---

1. This balancing test is only specifically required for impeachment involving prior criminal convictions. *See* Iowa R. Evid. 5.609.

been excluded. We also affirm the decision of the court of appeals that the prejudicial effect of the evidence warranted reversal.

## II. *Jury Instructions.*

■ Defendant claims ineffective assistance of counsel based on failure to object to jury instructions 21, 25, and 29. Defendant contended and the court of appeals agreed that the instructions improperly permitted the jury to find that Ben's death occurred from "shaking." While we agree that the instructions should have referred to "shaking that produced a blunt-force trauma," that omission in the instructions did not independently provide a basis for reversal. This issue may be clarified on retrial.

## III. *Improper Questioning and Comment by Prosecuting Attorney.*

■ Defendant complains about the conduct of the assistant county attorney prosecuting the case in several particulars. Among these were the following.

Dr. Jan Leestma testified for defendant that Ben's head trauma had occurred a considerable period of time prior to the 911 call. In cross-examining Dr. Leestma, the assistant county attorney asked the following questions:

Q. When we talk about the times that you did speak and didn't listen, but spoke, that one of those occasions was when you went to the public defender's conference earlier this year; isn't that true? A. I was invited to speak at the annual meeting in Sioux Falls—Sioux City. Sorry. And I gave a lecture there.

Q. That was in front of a bunch of defense lawyers, wasn't it? A. That's the organization, defense attorneys. I don't know who else was in the audience.

Q. That was the last time that you gave a presentation, was before a bunch of defense lawyers in the State of Iowa;

isn't that true? A. I wouldn't call them a bunch—it's an organization. And that's a pejorative comment. I gave a lecture there I was invited. I did it. I have no apologies to make.

The cross-examination continued to demean Dr. Leestma as a defendant's expert witness suggesting that he had only formed his conclusions concerning Ben's trauma after giving a presentation "in front of all the defense lawyers here in the State of Iowa." The witness was asked:

Q. You are routinely hired by the defense in cases where children are allegedly victims of child abuse and you testify on behalf of the perpetrator; isn't that true?

In a later question, the assistant county attorney implied that Dr. Leestma had been hired to testify forty-six times for people who were charged with killing children.

We have recognized that

[u]nfairly questioning [a witness] simply to make the defendant look bad in front of the jury regardless of the answer given is not consistent with the prosecutor's primary obligation to seek justice, not simply a conviction.

*State v. Graves,* 668 N.W.2d 860, 873 (Iowa 2003). The American Bar Association Criminal Justice Standards provide:

The interrogation of all witnesses should be conducted fairly, objectively, and with due regard for the dignity and legitimate privacy of the witness, and without seeking to intimidate or humiliate the witness unnecessarily.

ABA Standards for Criminal Justice: Prosecution Function 3–5.7(*a*) (3d ed.1993).

It is apparent that in the present case the prosecutor injected the issue of defendant's expert witness associating with defense lawyers and representing and testifying for perpetrators charged with killing

children as an improper effort to demean the witness. We condemn that act.

■ In his cross-examination of defendant, the assistant county attorney asked:

Q. You didn't treat him as your own child? A. I tried to help Ben, yes.

Q. You never sent Ben a sympathy card? A. I sent him something, yes.

Q. Did you ever send his parents a sympathy card to their home? A. No.

Q. You never went back to the hospital after Thursday the 16th to visit them or Ben? A. No.

Q. You knew he was alive on the 16th, didn't you? A. That's Thursday, the 16th?

Q. Yes. You knew he was alive didn't you? A. I went to the hospital.

Q. On the 17th you knew he was alive didn't you? A. Yes.

Q. You didn't visit him did you? A. No.

Q. On the 18th you never went over and visited his parents, did you? A. No.

Q. You never attended his funeral did you? A. No.

Q. You have never been to that little boy's gravesite, have you? A. No.

Q. The truth is that you knocked the life out of Ben and that's why you were afraid you were going to be arrested; isn't that true? A. No, that's not true.

Q. The truth is you robbed Jeff and Laura of their only son, didn't you? A. No I did not.

Q. You robbed that little boy of his life because he didn't fit within your schedule; isn't that true? A. No, it's not.

The foregoing questioning was clearly seeking to play upon the passions of the jury. Such questions violate a prosecutor's duty to keep the record free of undue denunciations or inflammatory utterances. *Graves,* 668 N.W.2d at 874.

■ As a final claim of prosecutorial misconduct, defendant asserts that during closing arguments the assistant county attorney held a baby book in front of the jury and stated that Ben's baby book will never be written. He then described several child activities that he asserted Ben would never get to perform, and for each such activity, he tore a page out of the book and dropped it on the floor until there were ten pages lying in front of the jury box. Unfortunately, for reasons that are not explained, no record was made of the final argument, so we may not confirm that these acts occurred. Notably, however, the State has not attempted to deny that this conduct took place. If it occurred, this conduct was an improper attempt to appeal to the passion and prejudice of the jury and should be condemned. *See* ABA Standards for Criminal Justice: Prosecution Function 3–5.8(c) (prosecutor should not make arguments calculated to appeal to the prejudices of the jury). The type of prosecutorial misconduct that we have identified should be avoided on retrial of defendant.

### IV. *Other Issues.*

Other matters argued by defendant include alleged trial court errors for limiting cross-examination of the State's witnesses about journal articles, refusing to permit cross-examination of the medical examiner concerning his failure of a board certification test and refusing to allow defendant to offer specific instances of good conduct. We are satisfied that these issues were decided correctly by the court of appeals.

We have considered all issues presented and conclude that the decision of the court of appeals should be affirmed. The judgment of the district court is reversed, and the case is remanded to that court for

further proceedings consistent with this opinion.

**DECISION OF COURT OF APPEALS AFFIRMED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**