# IN THE SUPREME COURT OF IOWA

No. 19–0838

Submitted February 17, 2021—Filed April 23, 2021

**STATE OF IOWA,**

Appellee,

vs.

**ZACHARY TYLER ZACARIAS,**

Appellant.

Appeal from the Iowa District Court for Polk County, Robert B. Hanson, Judge.

The defendant appeals his conviction for penetrative assault, challenging certain district court rulings and the effectiveness of trial counsel. **AFFIRMED.**

Christensen, C.J., delivered the opinion of the court, in which Waterman, Mansfield, and McDermott, JJ., joined. McDonald, J., filed a special concurrence in which Appel and Oxley, JJ., joined.

Andrew Dunn and Jessica Donels of Parrish Kruidenier Dunn Gentry Brown Bergmann & Messamer L.L.P., for appellant.

Thomas J. Miller, Attorney General, Louis S. Sloven, Assistant Attorney General, John P. Sarcone, County Attorney, and Nan Horvat and Michael Salvner, Assistant County Attorneys, for appellee.

**CHRISTENSEN, Chief Justice.**

The defendant appeals his conviction by a jury for assault "us[ing] any object to penetrate the genitalia or anus of another person" in violation of Iowa Code section 708.2(5) (2017) after he penetrated the victim's vagina with his finger while the victim was unconscious. On appeal, the defendant argues there was insufficient evidence to support his conviction because his finger did not constitute an "object" under section 708.2(5). He also argues the district court impermissibly restricted his ability to impeach the victim about prior inconsistent statements and maintains his trial counsel was ineffective in failing to impeach the victim on cross-examination and failing to object to alleged instances of prosecutorial misconduct. On our review, we affirm the defendant's conviction.

## I. Background Facts and Proceedings.

On the evening of May 28, 2017, C.G., then seventeen years old, was watching a movie with friends in Ankeny when she realized she did not have a ride to her parents' house in Urbandale in time to meet her 10:00 p.m. curfew. C.G. began texting and snapchatting people to arrange a ride. Zachary Zacarias, then twenty-one years old, was the only person who responded that he could give her a ride home, but he told C.G. that he needed to "sober up before he could take [her] home."

A friend dropped C.G. off at Zacarias's home, where a mutual friend greeted C.G. and led her to Zacarias's bedroom in the basement to interact with other guests who were present as part of a party Zacarias was hosting. By the time she arrived at the home, C.G. had already taken her Trazodone sleeping pill with the assumption that she was going to go home and go to bed shortly thereafter. When she arrived in the bedroom, C.G. smoked marijuana wax out of a bong. Zacarias gave C.G. a drink in a red Solo cup

that he claimed contained vodka and orange juice, though C.G. thought the consistency had an unusual "chalky taste to it."

C.G. soon became drowsy, so she laid down on the couch in the bedroom and told her friend to wake her if she fell asleep. She awoke "a little foggy" to find herself naked from the waist down with Zacarias on top of her wearing only his shirt. Zacarias held C.G.'s legs apart by placing his knees on her thighs and pressed one hand on her shoulder while he used his other hand to masturbate with his penis close to C.G.'s vagina.

C.G. hit Zacarias, causing him to roll off the couch. C.G. jumped off the couch and began screaming for help, and Zacarias kept repeating "nothing had happened yet." C.G. discovered the rest of her clothes scattered across the room and a dresser had been moved in front of the bedroom door. She was able to push the dresser aside and ran out of the house. As she was leaving, someone C.G. did not know ran after her, but C.G. told the person to "get away from [her.]." C.G. ran to her boyfriend's home about a block away.

C.G. started banging on the door of her boyfriend's home, which awoke him. He let her in, and the boyfriend's parents called the police. Two police officers responded and found C.G. "distraught." C.G. explained to the police her memory of what happened and that she never consented to Zacarias touching her body in any way. The police recommended C.G. go to the hospital for examination and a sexual assault kit, and C.G. subsequently went to Broadlawns Medical Center for an examination. Nurse Janie Pering described C.G. as "very sleepy," noting she "had to keep waking [C.G.] up multiple times during the exam." DNA analysis of a sample taken from C.G.'s underwear "tested positive for an enzyme that is produced in saliva, but that sample was not strong enough to be tested against the DNA of Mr. Zacarias," in addition to C.G.'s DNA profile.

After responding to C.G., the police officers went to Zacarias's home, where they found Zacarias waiting for them on his porch. Zacarias told the officers he asked his friends to leave the bedroom so he could be alone with C.G. and claimed C.G. "fell asleep or blacked out for a while" as they were "making out." He admitted to removing C.G.'s thong and then digitally penetrating her vagina with his finger.

He acknowledged that C.G. did not reciprocate his actions and did not touch his body in any way, and he claimed C.G. was "in and out of a state." When an officer asked Zacarias how C.G. "could have consented if she was 'blacked out,' " Zacarias told the officer that C.G. had relaxed her legs. He reiterated to the police that C.G. "never said no" and told them C.G. "freaked out" when he tried to have sex with her. The officer asked Zacarias why C.G. "freaked out," and Zacarias told them C.G. had consumed drugs and alcohol and was in and out of consciousness. At the end of the conversation, Zacarias also claimed he performed oral sex on C.G.

At some point after Zacarias's party, Meghan Storlie, another party attendee, messaged C.G. on Facebook after learning C.G.'s identity from a mutual friend. Storlie was the person who ran after C.G. when C.G. was leaving and wanted to check on C.G. C.G. shared the Facebook message with police, who subsequently contacted Storlie. Storlie told them she was in an adjacent room in Zacarias's basement on the night in question and heard a woman screaming, "What are you doing to me? Why are my pants off?" She then saw C.G. run out of the bedroom, and Storlie followed C.G. "to see if she was okay." C.G. responded, "Ma'am, please don't touch me. Get away from me," and then ran down the street. Storlie told police she returned to the house to confront Zacarias, asking him if he had raped C.G. Zacarias responded, "No, we had a thing."

The State initially charged Zacarias with sexual abuse in the third degree in violation of Iowa Code sections 709.1 and 709.4(1)(*a*) or (*d*) on August 1, 2017, but the charge was dismissed on August 22, 2018, due to a speedy trial violation. On October 1, 2018, the State refiled its criminal complaint, charging Zacarias with one count of assault by penetration of the genitalia with an object in violation of Iowa Code sections 708.1 and 708.2(5). The case was tried to a jury in April 2019. Zacarias's counsel filed proposed jury instructions defining an "object" under section 708.2(5) as "a material thing other than any portion of the defendant's body or organs." The State opposed this instruction, requesting the district court use the dictionary definition of "object" to define an "object" as "anything that is visible or tangible and is relatively stable in form." Zacarias also argued for a motion of acquittal based on his proposed definition of "object." The district court chose to use the State's proffered definition of "object" to instruct the jury and denied Zacarias's motion of acquittal, reasoning there was no authority to support Zacarias's proposition.

The jury found Zacarias guilty, and the district court sentenced him to an indeterminate term of ten years imprisonment. Zacarias was also required to register as a sex offender as part of his sentence. Zacarias filed a timely notice of appeal. We retained the appeal.

## II.  Standard of Review.

We review jury instruction challenges for the correction of errors at law to determine whether the challenged instruction correctly states the law. *State v. Shorter*, 945 N.W.2d 1, 6 (Iowa 2020). "Erroneous jury instructions are prejudicial and require reversal when they 'mislead the jury or materially misstate the law.'" *Id.* (quoting *State v. Benson*, 919 N.W.2d 237, 241–42 (Iowa 2018)). We generally review evidentiary rulings

for an abuse of discretion. *State v. Buelow*, 951 N.W.2d 879, 884 (Iowa 2020).

We may consider ineffective-assistance claims on direct appeal if "the appeal was already pending on July 1, 2019, when Senate File 589 eliminating the ability to pursue ineffective-assistance claims on direct appeal, took effect." *State v. Ross*, 941 N.W.2d 341, 345 (Iowa 2020). Here, Zacarias's challenge is properly before us on direct appeal because he filed his notice of appeal on May 19, 2019. We review claims of ineffective assistance de novo. *Id.*

### III. Analysis.

Zacarias presents numerous claims on appeal. First, he argues the district court erroneously instructed the jury on the definition of "object." Second, Zacarias contends the district court violated his due process right to present a defense and did not follow Iowa Rule of Evidence 5.613 by restricting his ability to impeach the complaining witness. Third, he claims his trial counsel was ineffective in failing to impeach C.G. on cross-examination. Fourth, Zacarias maintains his trial counsel was ineffective in failing to object to alleged instances of prosecutorial misconduct during trial. Finally, Zacarias argues the cumulative effect of trial counsel's errors denied him of his right to a fair trial.

**A. Motion to Strike Zacarias's Reply Brief.** In his initial brief, Zacarias argued the district court erroneously instructed the jury on the definition of "object," arguing an "object" under Iowa Code section 708.2(5) should be defined as "a material thing other than any portion of the defendant's body or organs." Zacarias claims, in relevant part, the district court's interpretation of "object" to include a defendant's hand "would create substantial and unnecessary overlap between" Iowa Code section 708.2(5) and Iowa Code section 702.17(5), which defines "sex act" or

"sexual activity" to include "any sexual contact between two or more persons by . . . use of artificial sexual organs or substitutes therefor in contact with the genitalia or anus." Iowa Code § 702.17(5). In its initial brief, the State responded to Zacarias's concern about overlap, asserting, "a construction that creates an overlap is preferable to one that creates an obvious gap, especially when it is clear that the legislature intended to close that specific gap through this particular enactment." In his reply brief, Zacarias claimed the State's proffered "broad interpretation subverts general due process principles applied to protect a defendant's rights in a criminal case." According to Zacarias, the State only charged him under section 708.2(5) "to get around its speedy trial violation and refile this case" after the district court dismissed the charge of third-degree sexual abuse against Zacarias for a speedy trial violation.

The State filed a motion to strike Zacarias's reply brief, arguing Zacarias failed to raise the due process argument in his initial brief and was instead presenting it as a new claim for the first time in his reply brief. Zacarias resisted, explaining he was "not arguing that his conviction violates due process or double jeopardy principles," nor did he preserve that claim for direct appeal. Instead, he stated he was using the chronology of his case to show "the dangers of letting the prosecution define statutes broadly to suit their purposes and cover mistakes." We issued an order explaining we would submit the motion to strike with the appeal.

We generally do not consider issues raised for the first time in a reply brief. *State v. Shackford*, 952 N.W.2d 141, 147–48 (Iowa 2020). Nevertheless, as Zacarias clarified in his resistance, he was not presenting a new claim that his conviction violated due process or double jeopardy, nor will we address such a claim. Rather, he discussed the chronology of

Zacarias's case to provide an example of the potential due process concerns implicated by the State's proposed broad statutory interpretation of section 708.2(5). In other words, Zacarias is presenting "additional ammunition for the same argument [he] made below—not a new argument advanced on appeal." *JBS Swift & Co. v. Ochoa*, 888 N.W.2d 887, 893 (Iowa 2016). The effect that a broad interpretation of a statute may have on constitutional rights is a valid consideration in determining the proper interpretation of a statute. *See, e.g.*, *State v. Aschbrenner*, 926 N.W.2d 240, 253 (Iowa 2019) (applying "the narrower interpretation" of a statute to avoid constitutional infirmities). Therefore, we deny the State's motion to strike Zacarias's reply brief.

**B. Interpretation of Iowa Code Section 708.2(5).** Zacarias maintains the district court erroneously instructed the jury on the meaning of "object" under Iowa Code section 708.2(5) when it instructed the jury that "[a]n 'object' means anything that is visible or tangible and is relatively stable in form." He asserts "object" under section 708.2(5) should not include a defendant's body or organs. Applying his desired interpretation of the statute, Zacarias also argues the district court erred in denying his motion for judgment of acquittal in which he argued there was no evidence that he penetrated genitalia using an object other than a part of his body. Section 708.2(5) provides, "A person who commits an assault, as defined in section 708.1, and who uses any object to penetrate the genitalia or anus of another person, is guilty of a class 'C' felony." Iowa Code § 708.2(5). The meaning of "object" under this statute is an issue of first impression for our court.

"The first step in our statutory interpretation analysis is to determine whether the statute is ambiguous." *Ross*, 941 N.W.2d at 346

(quoting *State v. Coleman*, 907 N.W.2d 124, 135 (Iowa 2018)). Our inquiry ends with the plain language if the statute is unambiguous. However,

> "if reasonable minds could differ or be uncertain as to the meaning of the statute" based on the context of the statute, the statute is ambiguous and requires us to rely on principles of statutory construction to resolve the ambiguity.

*Id.* (quoting *Coleman*, 907 N.W.2d at 135). As discussed above, the parties present at least two differing yet reasonable interpretations: Zacarias's interpretation that an object does not include any portion of the defendant's body or organs, and the State's interpretation that an object is anything visible or tangible and relatively stable in form—including a defendant's body or organs. Consequently, we must rely on our tools of statutory interpretation to determine the meaning of "object" under section 708.2(5).

We apply the rule of lenity in criminal cases, but we only do so as a last resort. *In re Prop. Seized from Bo Li*, 911 N.W.2d 423, 429 n.4 (Iowa 2018); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 197 (2012) [hereinafter Scalia & Garner] ("[T]he rule of lenity applies only when a reasonable doubt persists *after* the traditional canons of interpretation have been considered."). We still must interpret criminal statutes "reasonably and in such a way as to not defeat their plain purpose." *Coleman*, 907 N.W.2d at 136 (quoting *State v. Hagen*, 840 N.W.2d 140, 146 (Iowa 2013)). "[O]ur goal 'is to ascertain legislative intent in order, if possible, to give it effect.'" *Id.* (quoting *State v. Finders*, 743 N.W.2d 546, 548 (Iowa 2008)). If the legislature has not defined a word or "use[d] it with an established meaning, we give the words their 'ordinary and common meaning by considering the context within which they are used.'" *Ross*, 941 N.W.2d at 347 (quoting *Auen v. Alcoholic*

*Beverages Div.*, 679 N.W.2d 586, 590 (Iowa 2004)).  It is not our role to "change the meaning of a statute." *Id.* (quoting *Auen*, 679 N.W.2d at 590).

The dictionary defines "object" as "a discrete visible or tangible thing."  *Object, Webster's Third New International Dictionary* (unabr. ed. 2002).  The legislature chose to modify the term "object" with the term "any" to criminalize the use of "any object to penetrate the genitalia or anus of another person."  Iowa Code § 708.2(5); *see also* Scalia & Garner, at 167 ("Perhaps no interpretive fault is more common than the failure to follow the whole-text cannon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts.").  "Any" is defined as "one or more indiscriminately from all those of a kind," *Any, Webster's Third New International Dictionary* (unabr. ed. 2002), and we have explained that the legislature's use of "any" is "commonly understood to have broad application." *Swiss Colony, Inc. v. Deutmeyer*, 789 N.W.2d 129, 137 (Iowa 2010).

As the Court of Appeals of Virginia held in interpreting a similar statute, a statute that does not distinguish between animate and inanimate objects and "which proscribes sexual penetration with ' "any object" . . . addresses the universe of objects with which an accused may not sexually penetrate a complaining witness,' " including a defendant's finger.  *Herrel v. Commonwealth*, 507 S.E.2d 633, 636 (Va. Ct. App. 1998) (omission in original) (quoting *Bell v. Commonwealth*, 468 S.E.2d 114, 117 (Va. Ct. App. 1996)).  Various other state courts have also interpreted the phrase "an object" or "any object" in similar statutes to include a finger.[1]

---

[1]*See, e.g., State v. Todd*, No. 1 CA–CR 11–0842, 2012 WL 5397999, at *6–7 (Ariz. Ct. App. Nov. 6, 2012) (holding the defendant's penetration of another's vagina constituted "sexual conduct" by penetration under a statute that defined "sexual conduct" to include "actual penetration of the vagina by any object except when done as

Like those statutes, section 708.2(5) uses the phrase "any object" to apply broadly to "the universe of objects with which an accused may not sexually penetrate a complaining witness" without distinguishing between animate and inanimate objects. *Id.* (quoting *Bell*, 468 S.E.2d at 117). Zacarias is asking us to read a distinction into the statute where there is not one. *See Homan v. Branstad*, 887 N.W.2d 153, 170 (Iowa 2016) ("We cannot read into the statute what we think it ought to say. What the general assembly actually said guides our interpretation." (citation omitted)).

---

part of a medical procedure"); *State v. Grant*, 634 A.2d 1181, 1185–86, 1185 n.8 (Conn. App. Ct. 1993) (concluding defendant's use of his finger to penetrate the victim's vagina met the definition of "penetration," which the statute declared "may be committed by an object manipulated by the actor into the genital or anal opening of the victim's body" (quoting Conn. Gen. Stat. § 53a–65 (1992))); *State v. Elias*, 337 P.3d 670, 674 n.3 (Idaho 2014) (noting "[a] finger is an object for purposes of the statute" criminalizing forcible sexual penetration "by any object"); *Hurley v. State*, 560 N.E.2d 67, 68–69 (Ind. Ct. App. 1990) (holding defendant's finger constituted "an object" under a statute criminalizing sexual penetration "by an object"); *State v. Lucas*, 275 S.E.2d 433, 435–36 (N.C. 1981) (affirming defendant's second degree sexual assault conviction for penetrating the victim's genital opening with his fingers under a statute that criminalized "the penetration, however slight, by any object into the genital or anal opening of another person's body" (quoting N.C. Gen. Stat. § 14–27.1(4) (1980))); *State v. Hoover*, 280 P.3d 1061, 1063 (Or. Ct. App. 2012) (affirming defendant's conviction for unlawful sexual penetration in violation of a statute criminalizing sexual penetration by "any object" after defendant used his finger to penetrate the victim's vagina); *State v. Cain*, 624 P.2d 732, 733–34 (Wash. Ct. App. 1981) (holding "[a] finger is an object within the meaning and intent of the statute" criminalizing penetration with "an object"); *cf. People v. Keeney*, 29 Cal. Rptr. 2d 451, 452–53 (Ct. App. 1994) (affirming defendant's conviction for penetration by a foreign object under a statute that prohibited penetration "by any foreign object" based on defendant's action of directing the victim at gunpoint to lie down and insert the victim's own fingers into her vagina and anus); *Holmes v. State*, 842 So. 2d 187, 188 (Fla. Dist. Ct. App. 2003) (noting a defendant's finger constituted an "other object" in a sexual battery statute that prohibited "oral, anal, or vaginal penetration by, or union with, the sexual organ of another or the anal or vaginal penetration of another by any other object" (quoting Fla. Stat. § 794.011(1)(h) (1995))); *Burke v. State*, 430 S.E.2d 816, 817 (Ga. Ct. App. 1993) (concluding a finger was a "foreign object" in a sexual penetration statute that defined "foreign object" as "any article or instrument other than the sexual organ of a person" (quoting Ga. Code § 16–6–22.2(a) (1992))); *Commonwealth v. Prado*, 113 N.E.3d 365, 370 (Mass. App. Ct. 2018) (holding defendant's act of forcing the victim to penetrate her own genital opening with the victim's fingers met the statutory definition of rape under a law that criminalizes "sexual penetration by force and against the [victim's] will or by threat of bodily injury" (alteration in original)).

Those states that have concluded a finger does not constitute an "object" for penetration purposes have generally done so under different statutory language.[2] For example, the Supreme Court of Ohio concluded a finger did not constitute an "object" in a statute that prohibited the insertion of "any instrument, apparatus, or [o]ther object into the vaginal or anal cavity of another" by force or threat of force. *State v. Hooper*, 386 N.E.2d 1348, 1349–50 (Ohio 1979) (quoting Ohio Rev. Code § 2907.12(A) (1978) (repealed 1996)). It did so because it concluded the statute's list of "three nouns[,] two specific and the third, general" with the term "other" immediately preceding the general term spoke to the "legislative intent to limit the scope of the general noun to those objects having the characteristics of those specific nouns." *Id.* at 1350. The court noted the terms "instruments and apparatuses" had the common characteristic of being inanimate. *Id.* Thus, it reasoned, "[s]ince, under the doctrine of Ejusdem generis, nothing may be construed to fall within the catchall term 'object' unless it shares the characteristics of instruments and apparatuses, only inanimate objects fall within the" statute's purview. *Id.* Consequently, a finger did not meet this definition because it "is not inanimate." *Id.*

Ohio later amended its felonious sexual penetration statute to merge into the offense of rape and added language clarifying that penetration by a body part falls within that statute, stating penetration involves "the

---

[2]*See, e.g.*, *People v. Maggette*, 747 N.E.2d 339, 346, 349 (Ill. 2001) (concluding a finger was not an "object" under a sexual penetration statute that defined such penetration as "any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio or anal penetration," because the statute's inclusion of the phrase "any part of the body of one person or of any animal" limited "object" to inanimate objects only) (quoting 720 Ill. Comp. Stat. 5/12–12(f) (1998) (repealed 2011)).

insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another" "without privilege to do so."  Ohio Rev. Code Ann. § 2907.01(A) (West, Westlaw current through Files 1 to 4 and 6 to 8 of the 134th Gen. Assemb. (2021–2022)).  Unlike the Ohio statute, our current penetrative assault statute does not need amending to clarify that it includes a body part because our legislature did not use "object" as part of a list of inanimate objects in restricting what constitutes an "object" or provide any other indicator limiting the statute to only include inanimate objects.

Although Zacarias may be correct to note that "[a] person would not refer to themselves or their body parts as 'objects' in ordinary speech," the context in which "object" is used in section 708.2(5) further supports our conclusion that the definition of "object" includes body parts.  *See Ross*, 941 N.W.2d at 347 ("we give the words their 'ordinary and common meaning by considering the context within which they are used.'" (quoting Auen, 679 N.W.2d at 590)).  In the context of penetrative assault, there are numerous reasons why a defendant's body is associated with the term "object."  Most notably, it is not uncommon for victims of penetrative assault to be unaware of the specific object a defendant used to penetrate them, especially if the assault occurred in the dark or while the victim is in and out of consciousness.  Thus, while people might not refer to their own body parts as objects in casual conversation, they may very well refer to another person's body part as an object when describing his or her penetrative assault to others.

Under Zacarias's interpretation of "object," all a defendant in Zacarias's situation would have to argue to plant a seed of reasonable doubt under section 708.2(5) is that he penetrated the victim with his finger instead of an inanimate object in those situations when victims

cannot definitively say what the defendant used to penetrate them. When victims allege someone penetrated them with an unknown object, they are not foreclosing the possibility that the object was another person's body part. Accordingly, in the context of section 708.2(5), "any object" includes a defendant's body parts.

Moreover, we reject Zacarias's claim that including body parts in the definition of "object" violates the construction against surplusage and renders the term "object" meaningless because "[i]t would not be necessary to use the word 'object' if the body was also an object." He maintains, "[t]he statute may as well read 'a person who commits an assault . . . and who penetrates the genitalia or anus of another person, is guilty of a class 'C' felony." (Omission in original.) (Quoting Iowa Code § 708.2(5).) If section 708.2(5) omitted the "object" language and only applied to assaults in which a person penetrates another's genitalia, it could be read to only include body parts. Yet, the legislature opted to criminalize penetration by "any object," with no indication that it intended to exclude inanimate objects.

As the State aptly explains,

Penetration with body parts would have been covered by the simpler term "penetrates"—but that would arguably exclude penetration by inanimate objects. On the other hand, penetrative acts using inanimate objects would be covered [with] the phrase "uses an object to penetrate"—but that would arguably exclude any penetrative acts that used body parts. Only this formulation, which applies to penetrative assault using *any* object, succeeds in making this enhanced penalty applicable to both kinds of penetrative assault.

This interpretation also manifests section 708.2(5)'s purpose to remedy a gap in coverage that did not criminalize penetration by an object if the act of penetration was not sexual in nature. This gap was illustrated in *State v. Monk,* 514 N.W.2d 448, 451 (Iowa 1994) (en banc), when we

reversed a defendant's sexual abuse conviction because there was "substantial evidence to support a finding that the contact" between the defendant and victim "was not sexual in nature" when the defendant wrestled the victim to the ground and inserted a broom handle into the victim's anus while they were engaging in "horseplay." Because the statute defining "sex act" required the contact to be sexual in nature to constitute sexual abuse, the type of penetration that occurred as "horseplay" in *Monk* was only punishable as general assault and thereby subject to less severe consequences than the same act of penetration would have been if it was committed with a sexual purpose. *See id.* at 452 (Snell, J., dissenting) ("The holdings in *State v. Pearson* and *State v. Monk* have transformed our sex abuse statutes into general assault statutes where the assault has some effect on the reproductive or excretory organs of the victim or defendant."). The subsequent enactment of section 708.2(5) criminalizing penetrative assault regardless of whether it was sexual in nature as a class "C" felony closed the gap in punishment between sexual and nonsexual penetrative assault.

Zacarias's assertion that section 708.2(5)'s use of the term "object" does not include a defendant's body parts because "contact between a defendant's body and the victim's genitalia is already criminalized as a sex act under § 702.17" overlooks the fact that this contact is only criminalized as a sex act when it is sexual in nature. *Monk*, 514 N.W.2d at 450; *see also State v. Pearson*, 514 N.W.2d 452, 455 (Iowa 1994) (en banc) ("Not all contact is a 'sex act.' The contact must be between the specified body parts (or substitutes) and must be *sexual* in nature."). Although there is overlap between assault by penetration under section 708.2(5) and sexual abuse under section 709.1, it is not a complete overlap. Section 708.2(5) is far from superfluous. The mere existence of overlap is not problematic.

> When a single act violates more than one criminal statute, the prosecutor may exercise discretion in selecting which charge to file. This is permissible even though the two offenses call for different punishments. It is common for the same conduct to be subject to different criminal statutes.

*State v. Alvarado*, 875 N.W.2d 713, 718 (Iowa 2016) (quoting *State v. Perry*, 440 N.W.2d 389, 391–92 (Iowa 1989)). Overlap does not prevent "a single conviction on one charge based on the prosecutor's charging discretion." *Id.*

As we previously acknowledged in concluding a defendant's penetration of the victim with his finger fell within the definition of a "sex act" under section 702.17(5) because the "finger [w]as a substitute for a sexual organ,"

> It would not be logical to allow a defendant to be convicted of sexual abuse for using a plastic penis, or a similar inanimate object as a substitute for the plastic penis, but to prohibit his conviction if he used his fingers or hand. The emphasis in the offense of sexual abuse is on the forcible nature of the assault, not on whether defendant used his penis or his finger to carry out the sexual abuse.

*State v. Whetstine*, 315 N.W.2d 758, 760–61 (Iowa 1982). Likewise, here, it would not be logical to allow Zacarias to be convicted of assault by penetration for penetrating the victim with an inanimate object but to prohibit his conviction under the same statute because he used his finger instead. *See Gardin v. Long Beach Mortg. Co.*, 661 N.W.2d 193, 197 (Iowa 2003) ("[W]e must read a statute as a whole and give it 'its plain and obvious meaning, a sensible and logical construction.' " (quoting *Hamilton v. City of Urbandale*, 291 N.W.2d 15, 17 (Iowa 1980))). The emphasis in the offense under section 708.2(5) is on the penetrative nature of the assault, not on whether a defendant used his finger or an inanimate object to carry out the assault.

Here, the State seemingly did believe Zacarias's conduct was subject to different criminal statutes because it initially charged Zacarias with sexual abuse in the third degree—not assault by penetration—and only charged Zacarias with assault by penetration after the sexual abuse charge was dismissed due to a speedy trial violation. But Zacarias concedes he "is not arguing that his conviction violates due process or double jeopardy principles because he was retried in violation of a speedy trial ruling." On its face, section 708.2(5), as interpreted to include body parts, does not raise any constitutional concerns, and there is nothing prohibiting the State from charging Zacarias under section 708.2(5) just because the act may have been sexual in nature.

The district court properly instructed the jury that an "object" is "anything that is visible or tangible and is relatively stable in form." The evidence is sufficient to prove Zacarias committed assault by penetration with an object. Therefore, we affirm the district court's use of these jury instructions and its denial of Zacarias's motion for judgment of acquittal.

**C. The Scope of Impeachment.** Zacarias maintains the district court impermissibly restricted him from impeaching C.G. on inconsistent statements in violation of his due process right to present a defense and Iowa Rule of Evidence 5.613(*b*). He also contends the district court incorrectly applied our holding in *State v. Turecek*, 456 N.W.2d 219 (Iowa 1990), to prevent him from calling C.G. himself to present impeachment evidence. Zacarias failed to preserve most of these arguments.

Rule 5.613(*b*) provides in relevant part:

> Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires.

Iowa R. Evid. 5.613(*b*). During trial, the State argued Zacarias could not impeach C.G. on her prior statements because C.G. did not have the opportunity to explain those statements in violation of rule 5.613(*b*). Zacarias's trial counsel responded by arguing *Turecek* only "limited the ability of the prosecution to call a witness specifically for purposes of impeaching their statement," and he "believe[d] [he] would still be able to call [C.G.] and to confront her with those statements." He never claimed the evidence of C.G.'s prior statements was admissible because "justice so requires," and the district court never discussed whether justice required the statements' admission in its ruling. Zacarias admits in a different portion of his brief that he did not argue "justice required the impeachment proceed without [the necessary] foundation." Thus, Zacarias's claim that the district court improperly excluded the statements under rule 5.613(*b*) because "justice so require[d]" their admission is not properly before us on appeal. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). Likewise, Zacarias failed to present a due process argument in district court, so we will not address this constitutional claim on appeal. *See id.*

The State challenges error preservation on Zacarias's *Turecek* argument, claiming the district court's "ruling was limited to enforcing Rule 5.613(b) and its foundational requirement for impeachment by prior unsworn statements" and the district court "did not rule on any request by Zacarias to recall C.G." We disagree. During trial, both sides engaged in extensive discussion before the district court about the meaning of *Turecek*, including whether it allowed Zacarias to "call a witness for the sole purpose of impeachment." The district court subsequently stated it

found no authority suggesting *Turecek* applied only to the prosecution and declared, "I'm going to adopt the State's position and rule that the Rule 5.613, specifically subsection (b), applies equally to both sides" so that neither party could call a witness solely for impeachment. Thus, Zacarias preserved error on his *Turecek* argument because it is clear the district court considered the scope and applicability of *Turecek* in reaching its ruling. *See Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012) ("If the court's ruling indicates that the court considered the issue and necessarily ruled on it, even if the court's reasoning is 'incomplete or sparse,' the issue has been preserved.").[3]

Zacarias contends the district court incorrectly interpreted our ruling in *Turecek* to prohibit him from recalling C.G. for impeachment. In *Turecek*, a case involving sexual assault, the State called the defendant's six-year-old son to testify with the knowledge that he would testify unfavorably to the State so that the State could offer otherwise inadmissible evidence "in the guise of impeachment." *Turecek*, 456 N.W.2d at 224–25. We held the evidence was inadmissible for purposes of impeachment, reasoning,

> The right given to the State to impeach its own witnesses . . . is to be used as a shield and not as a sword. The State is not entitled under rule [5.]607 to place a witness on the stand who is expected to give unfavorable testimony and then, in the

---

[3]The State relies solely on its error preservation arguments in response to Zacarias's arguments in this section and did not brief the actual merits beyond claiming, "The trial court did not err in applying Rule 5.613(b) to prohibit Zacarias from impeaching C.G. with prior unsworn statements, without offering her a chance to confirm, deny, or explain them" in its brief heading. This is the second case in as many months in which the State has relied on procedural arguments without responding to the merits of a defendant's claim. We caution against this approach. While the State's failure to brief the merits of an issue does not entitle the defendant "to a reversal as a matter of right, . . . the court may, within its discretion, handle the matter in a manner most consonant with justice and its own convenience." *Bowen v. Kaplan*, 237 N.W.2d 799, 801 (Iowa 1976).

guise of impeachment, offer evidence which is otherwise inadmissible.

*Id.* at 225.

As we have reiterated in subsequent cases, "[t]he *Turecek* rule is a shield designed to prevent the introduction of otherwise inadmissible evidence." *State v. Russell*, 893 N.W.2d 307, 316 (Iowa 2017). Although we were dealing with a situation involving the State's actions, our ruling in *Turecek* limiting the scope of rule 5.607[4] applies to all parties, not just the State as Zacarias maintains. *See State v. Kone*, 557 N.W.2d 97, 102 (Iowa Ct. App. 1996) ("The rule established in *Turecek* is that *a party* may not place a witness on the stand who is expected to give unfavorable testimony and then, in the guise of impeachment, offer evidence that is otherwise inadmissible." (emphasis added)). We were interpreting general legal principles, and Zacarias offers no justification for why our ruling in *Turecek* would give a defendant the ability to place "a witness on the stand who is expected to give unfavorable testimony and then, in the guise of impeachment, offer evidence which is otherwise inadmissible" but not the State. Accordingly, we cannot say the district court abused its discretion when it declined to allow Zacarias to call C.G. to the stand for the sole purpose of impeaching her with otherwise inadmissible evidence.

**D. Zacarias's Ineffective-Assistance Claims.** Zacarias argues his trial counsel was ineffective in two regards. First, he challenges trial counsel's failure to impeach C.G. on cross-examination. Second, he contends trial counsel was ineffective in failing to object to instances of alleged prosecutorial misconduct. Additionally, Zacarias declares, "[t]he guarantee of 'assistance of counsel' under article I, section 10 is stronger

---

[4]"Any party, including the party that called the witness, may attack the witness's credibility." Iowa R. Evid. 5.607.

than the Sixth Amendment's guarantee." He asks us to depart from federal jurisprudence to reject the prejudice prong of the *Strickland*[5] test and instead adopt a harmless error standard.

"Generally, claims of ineffective assistance of counsel are preserved for postconviction relief proceedings." *State v. Harrison*, 914 N.W.2d 178, 206 (Iowa 2018) (quoting *State v. Soboroff*, 798 N.W.2d 1, 8 (Iowa 2011)). The postconviction-relief process "allows the parties to develop an adequate record of the claims and provides the attorney charged with ineffective assistance with the 'opportunity to respond to defendant's claims.' " *Id.* (quoting *Soboroff*, 798 N.W.2d at 8). We have previously preserved comparable claims that "trial counsel was ineffective in failing to challenge certain testimony and evidence presented at trial," *id.* at 208, and we believe preserving Zacarias's claims are also the appropriate course of action in this case "so an adequate record of the claim can be developed and the attorney charged with providing ineffective assistance may have an opportunity to respond to defendant's claims." *Id.* at 209 (quoting *Soboroff*, 798 N.W.2d at 8).

**IV.  Conclusion.**

For the aforementioned reasons, we affirm Zacarias's conviction and preserve the additional claims of ineffective assistance of counsel for postconviction-relief proceedings.

**AFFIRMED.**

Waterman, Mansfield, and McDermott, JJ., join this opinion. McDonald, J., files a special concurrence in which Appel and Oxley, JJ., join.

---

[5]*Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984).

**McDONALD, Justice (concurring specially).**

I concur in all parts of the majority opinion except division III.C. In my view, the defendant did not preserve error on the *Turecek* issue. The majority confuses two separate issues. The district court made a ruling on whether the defense would be allowed to call witnesses to offer extrinsic evidence of C.G.'s prior inconsistent statements under Iowa Rule of Evidence 5.613. The district court ruled the defense could not call witnesses to offer extrinsic evidence of C.G.'s prior inconsistent statements because there was insufficient foundation established under rule 5.613(*b*). The majority concludes that ruling was the *Turecek* ruling. I disagree. Rule 5.613 governs the use of extrinsic evidence to prove a prior inconsistent statement. *Turecek* is a substantive exception to the general rule set forth in 5.607 that a party may impeach its own witness. The issues are separate and distinct. The district court never ruled on the *Turecek* issue because the defense never actually attempted to call C.G. as a witness. Indeed, the defense had already released the witness on the record. The issue is not preserved.

To the extent the claim is preserved, I disagree with the majority's conclusion that the *Turecek* rule applies equally to the prosecution and the defense.[6] The *Turecek* rule, as originally stated, was uniquely a limitation on the government's ability to use impeachment as a subterfuge to offer otherwise inadmissible evidence:

---

[6]I have already expressed my view—not shared by Justices Appel and Oxley—that our *Turecek* jurisprudence is fundamentally flawed and should be reconsidered. *See State v. Swift*, 955 N.W.2d 876, 885 (Iowa 2021) (McDonald, J., concurring specially). To the extent this court continues to adhere to *Turecek*, I conclude the rule applies only to the prosecution and not the defense.

> *The State* is not entitled under rule [5.]607 to place a witness on the stand who is expected to give unfavorable testimony and then, in the guise of impeachment, offer evidence which is otherwise inadmissible. To permit such bootstrapping frustrates the intended application of the exclusionary rules which rendered such evidence inadmissible on *the State*'s case in chief.

*State v. Turecek*, 456 N.W.2d 219, 225 (Iowa 1990) (emphasis added). In *State v. Tracy*, we "condemned this sort of *prosecutorial maneuvering* in which *the State* places a witness on the stand who it expects to give unfavorable testimony solely for the purpose of introducing otherwise inadmissible evidence." 482 N.W.2d 675, 679 (Iowa 1992) (en banc) (emphasis added). *Tracy* explained that *Turecek* "qualified *the State*'s right to impeach its own witnesses." *Id.* (emphasis added). Recently, in *State v. Swift*, this court unanimously reaffirmed that the *Turecek* rule, as presently understood, is a limitation on the government's ability to call and impeach witnesses. 955 N.W.2d 876, 880 (Iowa 2021) ("But in *Turecek*, we held *the prosecution* may not 'place a witness on the stand who is expected to give unfavorable testimony and then, in the guise of impeachment, offer evidence which is otherwise inadmissible.' " (emphasis added) (quoting *Turecek*, 456 N.W.2d at 225)); *id.* ("We observed in *Turecek* that *the State*'s right to impeach its own witness under rule 5.607 'is to be used as a shield and not as a sword' . . . ." (emphasis added) (quoting *Turecek*, 456 N.W.2d at 225)).

The rationale for applying this special limitation on the government and not the defendant is that, under our current doctrine, *Turecek* is more a substantive rule of law that prevents a particular form of prosecutorial overreach and less a rule of evidence. The "prosecutor's use of a prior inconsistent statement to impeach a witness on mere subterfuge or for the primary purpose of placing before the jury substantive evidence which is

otherwise inadmissible may trigger Due Process and Confrontation Clause concerns." 27 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure: Evidence* § 6093, at 48 (2d ed. Supp. 2020). Presumably, this is why our current doctrine does not look to the rules of evidence to resolve a *Turecek* issue but instead looks to the prosecutor's subjective primary purpose in offering the evidence. When the prosecutor's primary purpose in calling the witness is a mere subterfuge to get otherwise inadmissible evidence in front of the jury, we conclude there was a "*Turecek* violation." This implies a violation of a substantive rule of law of potential constitutional dimension. The substantive and potential constitutional concerns underlying the *Turecek* doctrine are not implicated by the defense's similar offer of impeachment evidence.

I acknowledge some of our precedents state the *Turecek* rule prohibits *a party* from impeaching its own witness for the primary purpose of offering otherwise inadmissible evidence. These statements are inconsistent with the rationale underlying the *Turecek* rule, as presently understood. Further, to the best of my knowledge, while we have at times stated the rule broadly, we have never applied the *Turecek* rule against a criminal defendant or a party in a civil proceeding. *See, e.g., State v. Russell*, 893 N.W.2d 307, 316 (Iowa 2017) (discussing the *Turecek* rule as applied against the State); *State v. Tompkins*, 859 N.W.2d 631, 639 (Iowa 2015) (applying the rule to the government); *State v. Werts*, 677 N.W.2d 734, 737 (Iowa 2004) (discussing *Turecek* as a limitation on the "the State"); *State v. Nance*, 533 N.W.2d 557, 562 (Iowa 1995) ("However, where the State calls a witness expecting the witness will give unfavorable testimony, and then in the guise of impeachment, offers evidence otherwise inadmissible, the court should exclude the evidence."); *State v. Rojas*, 524 N.W.2d 659, 662 (Iowa 1994) (discussing "the State"

committing an alleged "*Turecek* violation"); *Tracy*, 482 N.W.2d at 679 (explaining the rule prevents the State's "prosecutorial maneuvering"); *Turecek*, 456 N.W.2d at 225 (explaining the rule as a limitation on "the prosecutor" (quoting *United States v. Miller*, 664 F.2d 94, 97 (5th Cir. 1981) (per curiam))); *State v. Sowder*, 394 N.W.2d 368, 371 (Iowa 1986) (reviewing the purposes of the prosecutor). We have never applied *Turecek* to any party other than the government in a criminal proceeding, which is further evidence that the *Turecek* doctrine, as presently understood, is more a substantive rule of law that prevents a particular form of prosecutorial overreach and less a pure rule of evidence. If we continue to follow *Turecek*, we should limit its application to the government in criminal cases and simply apply the rules of evidence in all other circumstances.

For these reasons, I concur in all parts of the majority opinion except division III.C. Because I conclude error was not preserved on the *Turecek* issue, I concur in the judgment.

Appel and Oxley JJ., join this special concurrence.