# IN THE COURT OF APPEALS OF IOWA

No. 23-2039
Filed June 18, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**MICHAEL WILLIAM TOBIN JR.,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Butler County, Rustin Davenport, Judge.

        A defendant appeals his convictions and sentence for eleven counts of sexual exploitation of a minor.  **AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR RESENTENCING.**

        Martha J. Lucey, State Appellate Defender, and Melinda J. Nye (argued), Assistant Appellate Defender, for appellant.

        Brenna Bird, Attorney General, and Louis S. Sloven (argued), Assistant Attorney General, for appellee.

        Heard at oral argument by Tabor, C.J., and Ahlers and Langholz, JJ.

**TABOR, Chief Judge.**

A jury convicted former police officer Michael Tobin Jr. of eleven counts of sexual exploitation of a minor in violation of Iowa Code section 728.12 (2021). Tobin appeals, arguing that the evidence could not support his nine convictions for promoting or possessing sexually explicit images of minors because he did so in the performance of his official duties. Short of that, he claims that six of the eight possession violations were not supported by substantial evidence. The State's load-bearing evidence was the testimony of C.T., a minor then-Officer Tobin lured into a sexual relationship. But, as Tobin notes, when testifying, C.T. identified only two photographs from the images that the State alleged he possessed outside the scope of his law enforcement duties.

Tobin also raises two evidentiary challenges. First, he argues that the district court should not have admitted testimony from a twenty-year-old woman about her contemporaneous affair with Tobin under Iowa Rule of Evidence 5.404(b). Second, he contends that the court misapplied rule 5.412 in excluding C.T.'s testimony that she was bisexual. Finally, Tobin contests his indeterminate fifteen-year sentence.

As explained below, we find no reversible error in the evidentiary rulings. On the first sufficiency claim, we find Tobin was not conducting official duties when he showed sexually explicit images to C.T. But the evidence was insufficient to prove he wrongly possessed six of those eight images. Thus, we vacate his possession convictions on counts four, five, six, seven, ten, and eleven. We

remand for entry of judgment of acquittal on those counts and for resentencing on counts one, two, three, eight, and nine.[1]

## I. Facts and Prior Proceedings

"This has happened to me twice now. So different, yet so similar." That haunting observation was the heart of the victim impact statement delivered by C.T., the State's key witness against Tobin. C.T. was fourteen when she was sexually exploited by an online predator named Cody Blue, and sixteen when she was sexually exploited by Tobin, the officer who investigated the Blue case.

C.T. met then-Officer Tobin when he interviewed her as part of the Clarksville police investigation into Blue's solicitation of nude pictures from minors online. After Blue was convicted and sentenced, C.T. again encountered Tobin. This time she bumped into him when she was out with her older sister, A.T., and their friends at a local festival in June 2021. Tobin—then thirty-three—recognized C.T. from the case and "appear[ed] to want to socialize." C.T. and the other teenagers were making TikTok videos, and Tobin joined in. His relationship with C.T. and A.T. developed from there.

Because C.T. and A.T. were interested in law enforcement careers, Tobin invited them to participate in "ride-alongs" in his patrol car. The first night out, according to A.T.'s testimony, Tobin drove to a secluded area, turned off his lights, and "started touching [her]" without asking permission. In the same vein, during her first ride-along with Tobin, C.T. recalled that "the Cody case got brought up." She told Tobin that she was embarrassed that he had seen naked photos of her.

---

[1] Given this remedy, we need not address Tobin's sentencing challenge.

He responded: "Don't be embarrassed. They looked good." And then he asked her if she still had them. She had kept them in her "My Eyes Only" file on Snapchat. She showed him, and he again commented on how good they looked. During the rest of that summer and early fall, C.T. rode with Tobin as often as three times per week for eight-hour shifts. C.T. recalled that Tobin peppered their conversations with sexual comments, for instance, bragging about his "dick size."

C.T. and A.T. also frequented the police station, which doubled as city hall. During a visit to the station in September 2021, C.T. saw a case folder labelled "Cody Blue" on Tobin's desk. According to C.T., "it had the case testimonies from some of the victims. And he would talk about that, and he helped me look at my testimony that was in the binder." Tobin also "opened up" his computer and showed her images from the Cody Blue file. She recalled "one video where a girl was masturbating with a hair brush."[2] C.T. also remembered seeing two still images of classmates from her high school, as well as one other "Snapchat picture of a girl taking nudity pictures in the mirror."

That same month, Tobin asked C.T. to "give oral sex to him." When she declined, he claimed he was joking. Yet Tobin persisted. In late October, he asked for photos of C.T. wearing "inappropriate" Halloween costumes she had received by mail. In early November, according to her testimony, Tobin "gave [her] oral sex" at the police station. After that, they continued to engage in sex acts both at the

---

[2] A.T. also testified that she was present at the station when Tobin was showing that video, but she was "not paying attention." A.T. added that she "didn't want to see the pictures of naked girls" because "that's disgusting."

station and in the patrol car during ride-alongs.[3] Tobin also asked C.T. to send him sexually explicit photos of herself. She testified: "He wanted me to put my phone in between my legs and take a picture of both genital holes." She did as he asked. Tobin told both C.T. and A.T. to delete any messages from him.

In February 2022, C.T. was at the station when her friend L.M. sent a Snapchat photograph of her bare buttocks, "asking if it looked good." C.T. recalled that Tobin told her to ask L.M. for more photos like that. C.T. texted L.M.: "send more my love." C.T. also testified that Tobin expressed concern when he learned that L.M. knew about his sexual relationship with C.T. According to C.T., his proposed solution was to "invite her to have a threesome, and that way she wouldn't be able to say anything."

That same month, on Valentine's Day, C.T. spent the evening at the police station, having sex with Tobin. After sex, she was giving him a foot massage when the Clarksville mayor walked in. The mayor asked Tobin why she was there. Tobin lied, telling the mayor that he was fixing C.T.'s car, which she would park inside the station's garage to avoid suspicion. Also around Valentine's Day, C.T. thought she might be pregnant and took a home pregnancy test, which her mother found. C.T. lied to her mother, telling her that she was involved with "a random guy from school." In reaction, her mother grounded C.T. and took away her phone.

Without her phone, C.T. switched to contacting Tobin by Google Docs that she accessed through her school-issued Chromebook. C.T. recalled that their

---

[3] Unbeknownst to C.T., Tobin was also having sex with A.T. that summer. A.T. testified that Tobin also showed her the Cody Blue file, making jokes about the victims in that case.

exchanges included "a lot of sexual communication." For instance, Tobin sent her a "picture of him in a mirror. He was completely unclothed with only cowboy boots on." He also requested more nude photos of C.T. and sent her links to videos on a pornography website. C.T. revealed that she often had these sexually charged communications with Tobin during her Advanced Placement (AP) government class. In AP government, C.T. sat next to M.C., who disapproved of her relationship with Tobin. M.C. could see them talking on the Google Doc and was "really grossed out" by the sexually explicit nature of their conversation. Concerned that her friend was being "groomed," M.C. reported the incident to school officials.

The school principal's inquiry led to a criminal investigation against Tobin. Because of the conflict with local officers, Special Agent Matthew Schalk with the Iowa Division of Criminal Investigation led that investigation. Armed with witness interviews and digital files, the State charged Tobin with eleven counts of sexual exploitation, including two class "C" felonies under Iowa Code section 728.12(1) for soliciting sexually explicit photos of minors (counts one and two), one class "D" felony under section 728.12(2) for promoting a sexually explicit video of a minor (count three) and eight aggravated misdemeanors under section 728.12(3) for possessing explicit images of minors (counts four through eleven). In counts three through eleven, the trial information alleged that Tobin did not promote or possess the sexually explicit images for any law enforcement purposes because he showed them to C.T.

The jury convicted Tobin as charged, and the court sentenced him to a term not to exceed fifteen years in prison followed by a lifetime special sentence under chapter 903B.  He appeals.

## II.     Analysis

### A.  Sufficiency of the Evidence

Tobin raises two challenges to the State's proof of sexual exploitation in counts three through eleven.  First, he contends the State did not prove that he promoted or possessed the explicit images outside of his capacity as a police officer.  Alternatively, Tobin claims that testimony from C.T. and Agent Schalk could only prove his promotion of the video (count three) and his possession of two other images (counts eight and nine).

We review his sufficiency claims for the correction of legal error.  *State v. Kieffer*, 17 N.W.3d 651, 655 (Iowa 2025).  We will not disturb the jury's verdicts if they are supported by substantial evidence.  *Id*.  Evidence is substantial if it can persuade a reasonable fact finder that the accused is guilty beyond a reasonable doubt.  *Id*.  When assessing sufficiency, we view the record in the light most favorable to the State, embracing all reasonable inferences we may fairly draw from the evidence.  *Id*.

Our assessment starts with the marshaling instructions for the challenged counts.  For count three, the State had to prove these elements:

> 1. [B]etween September 1, 2021, and November 1, 2021, the defendant knowingly promoted printed material, picture, photograph, motion picture, or other pictorial representation or recording.
> 2. The material depicted a live performance of a person under the age of 18 years engaging in fondling or touching the pubes or genitals of a minor.

For counts four through eleven, the State had to prove these elements for eight minors—identified by their initials:

> 1. [B]etween September 1, 2021, and November 1, 2021, the defendant knowingly possessed a negative, slide, book, magazine, or other print or visual medium;
> 2. That material shows [. . .], a person under the age of 18 years, engaging in a prohibited sexual act . . . .

The jury found that the State satisfied its burden on all nine counts. Tobin now contests those verdicts.

### 1. Performance of Official Duties

Recognizing his role as lead investigator in the Cody Blue case, Tobin did not dispute his access to the images in that file. Neither did he contest that the images as charged in counts three through eleven "depict[ed] female minors engaged in prohibited sexually explicit acts or simulations." And for each count, he stipulated that the named victim was a minor when the image was created. In accepting the stipulation, the court said its purpose was to avoid calling the minors depicted as witnesses and to "streamline matters" at trial.

Given those admissions, Tobin focused his defense on Iowa Code section 728.12(4), which provides an exception to sexual exploitation for law enforcement officers who handle explicit images in the performance of their official duties.[4] He contends that the State did not prove that his promotion or possession of the depictions in counts three through eleven fell outside his role as a police

---

[4] The court instructed the jury that "[a]n exception to the charges against the defendant is if his conduct occurred in the performance of his official duty as a law enforcement officer. The State contends the alleged acts were not part of his performance of his official duty as a law enforcement officer."

officer.[5]  To support this contention, he notes that he only accessed the explicit images on his work computer.  He also claims that the exception at section 728.12(4) applies because he "showed them to C.T. and A.T. in the police department while he was on duty, while they were participating in a ride-along program with the Clarksville Police Department."

The State refutes Tobin's claim that his actions were in the performance of his official duties.  In the State's view,

> the evidence showed that Tobin accessed the Cody Blue file and showed the explicit images and video to C.T. and her sister, as a way to add more of a sexual dimension to his interactions with them and to erode boundaries that he hoped to cross for sexual gratification— not for any purpose related to a legitimate law-enforcement function.

As its bottom line, the State argues that Tobin's scope of duty was a fact question for the jury to decide.  *Cf. Bodin v. Vagshenian*, 462 F.3d 481, 484–86 (5th Cir. 2006) (explaining in appeal under the Federal Tort Claims Act that scope-of-duty determinations were generally fact questions but noting that trial court's finding that employee's conduct was motivated by personal gratification "forecloses the conclusion that he was acting within the scope of his employment").

We agree that the State presented sufficient evidence for the jury to find that Tobin was not performing his official duties when possessing or promoting the sexually explicit images of minors.

On the promotion count, the jury could accept C.T.'s testimony that Tobin "opened up" the Cody Blue file on his computer and played a video showing "a girl

---

[5] The court instructed the jury that "promote" means to "procure, manufacture, issue, sell, give, provide, lend, mail, deliver, transfer, transmute, transmit, publish, distribute, circulate, disseminate, present, exhibit or advertise."  *See* Iowa Code § 728.1(8).  But the court did not define "possession" in the jury instructions.

masturbating with a hair brush." Reasonable jurors could easily find that Tobin was not performing his official duties when showing that video to C.T.—telling her that "it was Cody's fetish." And C.T. testified that Tobin wasn't doing any police work when exhibiting the video.

On the possession counts, the law enforcement exception did not immunize Tobin's act of showing the sexually explicit images to C.T. to satisfy his personal motivations removed from any law enforcement role. *Cf. Godar v. Edwards*, 588 N.W.2d 701, 707 (Iowa 1999) (addressing question of respondeat superior and finding alleged sexual abuse by Edwards was "conduct so far removed from his authorized duties" as a school district employee that the scope of his employment was properly determined by the court). True, the court did not define possession for the jury. But Tobin stipulated that he had access to the Cody Blue file. When he used that access to show the explicit images to a civilian, without any connection to an ongoing investigation, and with whom he desired a sexual relationship, his possession fell outside his official duties. As the State persuasively argues, "While he may have 'possessed' those files for a legitimate law-enforcement purpose while they lay dormant in his folders, that possession *exceeded* the scope of his law-enforcement duties when he showed them to teenage girls whom he was trying to groom for sex." Contrary to Tobin's argument, the State's evidence was sufficient to show that he promoted and possessed the images outside his role as a law enforcement officer.

### 2. Identification of Specific Images

Beyond asserting that he was acting in his official role, Tobin argues that the State only presented proof that he promoted the video in count three and

possessed the images of H.G. in count eight and M.H. in count nine. He asks us to vacate his convictions on counts four, five, six, seven, ten, and eleven.

To support this fallback argument, Tobin points to C.T.'s testimony that she could identify only two of the minors in images from the Cody Blue file—H.G. and M.H.—who were classmates from her high school. C.T. also recalled seeing a girl masturbating in the video. The only other specific image that she recalled was "a Snapchat picture of a girl taking nudity pictures in the mirror, and she had a red squiggly line over her face." But the State did not connect that image to counts four, five, six, seven, ten, or eleven—each of which listed the initials of a specific victim. For her part, A.T. testified that she did not look at the images because they were "disgusting." And, according to Tobin, the State did not gain any helpful details from the testimony of Agent Schalk, who interviewed C.T. Schalk recalled showing C.T. about twenty redacted images from the roughly one-hundred photographs in the Cody Blue file. He testified: "There was some images that she saw where she knew the person in the image and then there was images she either just confirmed that she had seen that image before." Schalk offered nothing beyond those generalities.

The State challenges the premise of Tobin's argument, asserting that "Tobin was not convicted for *showing* those materials to C.T.—he was convicted for *possessing* them." *See* Iowa Code § 728.12(3). In the State's view, proof that Tobin "showed *at least some* of the explicit materials within that file to C.T. and her sister was proof that he had accessed/possessed the whole file (and its stipulated contents) while acting outside of the scope of any official duty."

Trouble is, the State's theory—from the filing of the trial information—has been that Tobin was acting outside of his police role because he *showed* the explicit images to C.T. The district court explained its basis for denying the defense motion for judgment of acquittal: "I think the evidence is that the materials in Counts 4 through 11 were shown to C.T., which is what is alleged." And on appeal, the State acknowledges that the touchstone for Tobin's unlawful possession of the images was "when he showed them to [the] teenage girls"—not when they "lay dormant in his folders." So because C.T. could identify only two photos that Tobin showed her, the State did not prove that Tobin possessed the other images outside of his official duties. And the stipulation does not save the State. In it, Tobin conceded the sexually explicit content of the images charged in counts three through eleven and that the images depicted specific minors. He also stipulated to having access to the images because "he was investigating the Cody Blue case." But Tobin did not stipulate that he was guilty of those counts.[6]

Because the State failed to offer evidence to support its allegations that Tobin showed the images to C.T. for counts four, five, six, seven, ten, and eleven, those convictions cannot stand. The proof presented at trial—even viewed in the light most favorable to the State—could not convince a rational jury of Tobin's guilt for those counts. *See State v. Fenton*, 13 N.W.3d 573, 579–80 (Iowa 2024). In its

---

[6] The trial prosecutor misrepresented the strength of the stipulation in closing argument, saying:

> Now let's talk about the evidence. Like I say, I don't think they'll sit here and challenge Count IV to Count XI. They simply can't. They have a stipulation to it. I don't think they'll fairly come here and tell you, 'Oh, don't find him guilty of that.' I don't think so. They stipulated to it.

appellee's brief, the State argued that if we did reach this outcome, the correct remedy is to vacate Tobin's convictions on counts four, five, six, seven, ten, and eleven and remand for resentencing on counts one, two, three, eight, and nine. We agree with that remedy. *See State v. Vandermark*, 965 N.W.2d 888, 895 (Iowa 2021) (explaining the appellate court may remand for resentencing even if sentences are severable).

## B. Evidentiary Challenges

Next, Tobin renews his objections to two evidentiary rulings. First, he contends the district court should have excluded testimony from C.G., a twenty-year-old woman who had a sexual relationship with Tobin contemporaneous to his liaisons with C.T. and A.T. Second, he urges that the court should have allowed him to ask C.T. about her revelation on a TikTok video, offered into evidence by the State, that she was bisexual. We review both claims to see if the court abused its discretion. *See State v. Alberts*, 722 N.W.2d 402, 407 (Iowa 2006) (rape shield); *State v. Thoren*, 970 N.W.2d 611, 620 (Iowa 2022) (other bad acts).

### 1. Admission of Other Bad Acts Evidence

Before trial, Tobin moved to exclude testimony from C.G., who met Tobin in 2019 when she worked as a clerk at the local convenience store. At first, he just flirted with her, but when they started texting in 2021, their conversations turned sexual. Like C.T. and A.T., C.G. would meet Tobin for trysts at the police station while he was on duty late at night. He also asked her to send him nude pictures of herself. And he texted her nude photos of himself, asking her to delete them.

In his motion in limine, Tobin urged that C.G. had no relevant information and the State was only using her testimony for "character assassination." He

argued the evidence of his sexual relationship with C.G. was inadmissible under Iowa Rule of Evidence 5.404(b). Under that rule, "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Iowa R. Evid. 5.404(b)(1). In other words, the rule prohibits evidence that "serves no purpose except to show the defendant is a bad person." *State v. Rodriquez*, 636 N.W.2d 234, 239 (Iowa 2001). But such evidence "may be admissible for another purpose such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Iowa R. Evid. 5.404(b)(2).

Rule 5.404(b) is a rule of exclusion. *See State v. Wilde*, 987 N.W.2d 486, 495–96 (Iowa Ct. App. 2022). Unless the prosecutor offers a legitimate, noncharacter theory of admissibility, the bad-acts evidence must be kept out. *Thoren*, 970 N.W.2d at 625. Admissibility depends on three questions: (1) was the evidence relevant to a disputed factual issue, (2) is there clear proof the defendant engaged in the act, and (3) does the danger of unfair prejudice from its admission substantially outweigh the act's probative value? *Id.* at 626.

The trial prosecutor contended that the State needed C.G.'s testimony to show that Tobin had "no legitimate purpose to possess the photos" and his possession was not a mistake or an accident. The prosecutor also argued that the evidence went to Tobin's intent, motive, "and all the other factors that 404(b) allows." The district court denied Tobin's motion to exclude, noting that C.G.'s encounters with Tobin revealed "similar facts" at a "similar time" to the conduct reported by C.T. From there, the court decided "it goes to proof of the State's theory of the defendant's plan or intent."

During trial, Tobin renewed his objection to C.G.'s testimony. But the court stuck to its ruling:

> We've had similar testimony from other witnesses that this is the way that the defendant acted towards [C.T.], and that there's been challenge or at least a question raised regarding her credibility about the incidents. And to have similar acts is relevant in order to show . . . essentially, a common scheme taking place here.

The court allowed C.G. to testify about her sexual relationship with Tobin and admitted two exhibits containing a series of sexually explicit text messages, including a semi-nude photo of Tobin.

But to guard against the jury misusing the evidence, the court gave this limiting instruction:

> [Y]ou will hear evidence from the next witness, [C.G.], concerning [her] relationship with the defendant. Considerations of this evidence is limited to understanding if there was a motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident regarding defendant's relationship with [C.T.]. The defendant is not on trial concerning [C.G.].

Dissatisfied with that measure, Tobin reprises his objection to C.G.'s testimony on appeal.[7] His attack is three-pronged. One, he argues that his extramarital affair with C.G. was not relevant to his intent or lack of mistake because he did not deny having a sexual relationship with C.T. Two, Tobin contends that C.G.'s testimony was inadmissible to prove a common scheme or plan because evidence of his relationship with C.G. "involves wholly independent acts" and an unrelated sexual partner. *Thoren*, 970 N.W.2d at 632. Three, he balks at the State's suggestion that the evidence was admissible to bolster C.T.'s

---

[7] We agree with Tobin that the limiting instruction was not "specifically tailored to the reasons for allowing the testimony." But it did properly advise the jury that he was not on trial for his conduct with C.G.

credibility.  For that third point, he quotes *State v. Mitchell*: "If the State is allowed to prevail on its theory that there is an independent relevancy to bad-acts evidence for credibility purposes, this doctrine could be invoked in nearly every criminal case."  633 N.W.2d 295, 300 (Iowa 2001).  Tobin adds: "Allowing a jury to consider the evidence for credibility purposes is essentially allowing it to use it for propensity purposes."  *Thoren*, 970 N.W.2d at 631.

On appeal, the State retreats from its trial position.  The State now concedes that C.G.'s testimony did not show a common scheme or plan.  Instead, the State argues that C.G.'s testimony was admissible to "corroborate" certain details of C.T.'s testimony.  But the State insists that this case differs from *Mitchell* and *Thoren*.  According to the State, in those cases, "the credibility-bolstering effect" of the other-acts evidence "could only arise from a propensity inference."  In other words, "he did it before so he must be lying about not doing it now."  By contrast, here, the State argues that it needed C.G.'s testimony to show that, like C.T., she was asked by Tobin to delete his compromising messages.  And to show how he used the same method to let them into the police station at night.  If we don't accept that distinction, the State asks us to find that admission of C.G.'s testimony was harmless error.

We choose that last option.  Assuming without deciding that C.G.'s testimony should have been excluded under rule 5.404(b), we find its admission did not prejudice Tobin's defense.  Tobin "may claim error in a ruling to admit or exclude evidence only if the error affects [his] substantial right[s]."  Iowa R. Evid. 5.103.  When, as here, the defendant claims a nonconstitutional error, the test is whether his rights have been "injuriously affected by the error" or whether

he has "suffered a miscarriage of justice." *See State v. Parker*, 747 N.W.2d 196, 209 (Iowa 2008). We presume prejudice and reverse unless the record affirmatively shows otherwise. *Id.*

Several factors show that Tobin was not prejudiced. First, the district court gave the jury a limiting instruction just before C.G.'s testimony. "We have often recognized the importance limiting instructions have in minimizing prejudice." *State v. Martin*, 704 N.W.2d 665, 673 (Iowa 2005).[8] Second, C.G.'s testimony did not forge new ground. A.T. testified to many of the same corroborative facts as C.G. without objection. *See State v. Duncan*, 710 N.W.2d 34, 45 (Iowa 2006) (finding no reversible error where "the testimony was cumulative"). Third, through C.T.'s testimony, the State offered very strong evidence on counts one, two, three, eight, and nine. *See Wilde*, 987 N.W.2d at 498 (noting strength of State's case can make error harmless). So we decline to order a new trial on this ground.

## 2. Rape Shield Ruling

Tobin's second evidentiary challenge involves Iowa's rape shield rule. In proceedings involving alleged sexual misconduct, evidence is inadmissible if it is (1) offered to prove that a victim engaged in other sexual behavior or (2) offered to prove a victim's sexual predisposition. Iowa R. Evid. 5.412(a).

Tobin claims that the district court misapplied this rule in granting the State's motion to exclude evidence of C.T.'s bisexuality. To set the stage, we consider C.T.'s direct testimony, during which the State offered Exhibit 43, a TikTok video

---

[8] We recognize that the limiting instruction did not "identify the specific purpose or purposes to which the evidence [was] relevant." *Thoren*, 970 N.W.2d at 627. But it did caution the jury that Tobin was "not on trial for" his conduct with C.G. *See State v. Putman*, 848 N.W.2d 1, 15 (Iowa 2014).

of C.T. and her sister A.T. lip-syncing to a song in the police station while Tobin stood watching. The lyrics included: "Oh my, oh my, oh my God. This girl straight and this girl not." On cross-examination, defense counsel asked C.T. about the significance of those lyrics. She responded: "I came out as bi in that to Tobin."

The prosecutor objected under rule 5.412, asking for C.T.'s response to be stricken from the record. Defense counsel responded: "Your Honor, he opened the door by playing the video." Outside the presence of the jury, the prosecutor countered: "[T]here's no door open from the State. I mean, there was nothing that was mentioned about her sexuality. Nothing about that in the video, or anything to that extent." The court questioned the relevancy of C.T.'s sexuality. Defense counsel pointed out that C.T. had testified how her friend L.M. sent her a photo of her naked buttocks "asking if it looked good." And C.T. recalled: "Tobin instructed that I text her and ask her for more." Defense counsel suggested the video drew that testimony into question—"but stating that she's bisexual, it puts into doubt whether he's the one requesting them or she is." The court ruled that the evidence of C.T.'s "sexual predisposition" should be excluded under rule 5.412(a). And it granted the State's motion to strike C.T.'s answer to defense counsel's question about the significance of the lyrics.

Tobin challenges that ruling on appeal, claiming that the district court misapplied rule 5.412(a). He asserts that L.M., not C.T., was the sexual exploitation victim under count two, the class "C" felony. From there, he notes that the rape shield rule applies only "to prohibit the admission of other sexual behavior or sexual predisposition of *victims,* it does not prohibit the admission of C.T.'s sexual orientation to allow for Tobin to defend himself against allegations he

solicited L.M. for a nude photo." Tobin also maintains that he was prejudiced by the erroneous exclusion of evidence suggesting that C.T. had a personal motive to solicit the sexually explicit photographs of L.M. In his view, "Given that the request came from C.T.'s Snapchat account and did not identify Tobin as the actual person making the request, Tobin's defense that he did not tell C.T. to ask for the images is probable, particularly in light of C.T.'s sexual orientation."

The State defends the rape-shield ruling on four levels. First, it contends that Tobin didn't preserve error on this "interesting argument" because he did not present it to the district court. Second, it argues C.T. *was* a victim of that solicitation offense because Tobin "instructed that [she] text L.M and ask her for more" nude photos. Third, the State suggests that we could bypass the rape shield issue and decide that C.T.'s sexual orientation was inadmissible under rule 5.404(a)(1) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."). Fourth and finally, the State contends that any error in the court's rape-shield ruling was harmless.

We choose to bypass the State's error preservation argument and affirm the district court on the merits. In doing so, we keep in mind that the purpose of rule 5.412 is "to (1) protect the privacy of victims, (2) encourage reporting, and (3) prevent time-consuming and distracting inquiry into collateral matters." *State v. Mitchell*, 568 N.W.2d 493, 497 (Iowa 1997). Tobin's argument that C.T. was not the victim of count two—even if it had been presented to the district court—does not carry the day. C.T. was "a victim" of another count tried in these proceedings, which involved sexual misconduct. So evidence offered to prove her sexual

predisposition was inadmissible under the plain language of rule 5.412(a).  The district court did not abuse its discretion in excluding that evidence.

III.     **Summary**

To recap, we vacate Tobin's possession convictions on counts four, five, six, seven, ten, and eleven and remand for entry of judgment of acquittal on those counts.  We affirm his convictions on counts one, two, three, eight, and nine, and remand for resentencing.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR RESENTENCING.**